[885 NYS2d 582]

In the Matter of the Appointment of a Guardian for CHAIM A.K.

Surrogate's Court, New York County, August 21, 2009

**APPEARANCES OF COUNSEL**

Petitioners pro se.

**OPINION OF THE COURT**

KRISTIN BOOTH GLEN, S.

This case presents an important question for courts, and potentially for the legislature:[1] to what extent do the shortcomings of article 17-A of the Surrogate's Court Procedure Act require that it be narrowly construed where mental illness, as well as mental retardation or developmental disability, may be the reason a guardian is required.

The Instant Application

Petitioners here are the parents of Chaim A.K., born March 19, 1988. Because Chaim has reached his majority, his parents have lost legal authority to make decisions, especially medical decisions for him, unless they obtain some form of court authorized guardianship. This is particularly troubling because Chaim has required relatively frequent hospitalizations and, as he himself admits, cannot bring himself to authorize treatment even if it is in his best interests.[2]

In support of their petition, Chaim's parents submitted information from four separate sources. Two are M.D.s who filled out form affidavits to which other documentation is attached;

---

**1.** In 1990 the legislature directed a study to reevaluate SCPA article 17-A including possible procedural changes, in light of changes in "care, treatment and understanding of [mentally retarded and/or developmentally disabled] individuals" as well as new legal theories and case law relating to the rights of such persons. (L 1990, ch 516, § 1.) The legislature noted

> "since this statute was enacted in 1969, momentous changes have occurred in the care, treatment and understanding of these individuals. Deinstitutionalization and community-based care have increased the capacity of persons with mental retardation and developmental disabilities to function independently and make many of their own decisions. These are rights and activities which society has increasingly come to recognize should be exercised by such persons to the fullest extent possible. While guardians appointed pursuant to article 17-A of the surrogate's court procedure act must have the authority to make decisions to ensure the ward's best interest, such decision-making authority by the guardian should not infringe on the right of the ward to make decisions when he or she is capable. The legislature also notes that there exists a national consensus that guardianship, for all persons, should be subject to review." (*Id.*)

Proposed amendments were to be submitted to the legislature by the close of 1991. During that period the Law Revision Commission studied adult guardianship and recommended passage of Mental Hygiene Law article 81, discussed below. No action, however, was taken as to SCPA article 17-A, and the reassessment and changes anticipated almost two decades ago have yet to occur.

**2.** At his hearing Chaim was candid about his unwillingness or inability to deal with doctors or medical issues, and expressed his preference that his parents do so in his stead. Unfortunately, there is no provision in SCPA article 17-A that permits a guardianship limited to medical decision making.

one is the report of a psychologist who did an evaluation in 2007; the last is a batch of information relating to Chaim's educational setting in the New York City public school system. Read together, they describe a young man who functioned adequately in regular school classes through fifth grade; he was subsequently placed in special education, where he remains to this day.

The report from his annual individualized education program assessment conference states: "Significant academic and emotional difficulties warrant a more restrictive setting to address his needs and provide functional academic and vocational training."

Assessments and testing[3] done to determine his eligibility for educational benefits and services from the State Office of Mental Retardation and Developmental Disabilities (OMRDD) consistently show that Chaim scores "low" in communication, daily living and socialization skills, and Stanford-Binet scores of 72 on nonverbal IQ (borderline range) and 51 on verbal IQ (mild to moderate mental retardation range) result in an overall full scale IQ of 59, just below the first percentile, thus resulting in a finding of cognitive functioning within the mild mental retardation range. His scores on the Weschler Abbreviated Scale of Intelligence give him a "Borderline" on verbal, "Low Average" on performance, and "Borderline" on full-4.[4]

When, however, one looks behind the raw numbers, including the more fully fleshed out reports, especially of Dr. Sheenie Ambardas, his treating psychiatrist,[5] a somewhat different picture emerges. Chaim has a long history of psychological and emotional problems which have contributed to his educational

---

3. The assessment measures employed include the Weschler Abbreviated Scale of Intelligence, the Woodcock-Johnson Tests of Achievement, Third Edition, the Vineland Adaptive Behavior Scales, Second Edition, and the Stanford-Binet Intelligence Scales, Fifth Edition.

4. These privately done evaluations are slightly suspect as their purpose is to obtain benefits for which Chaim would not be eligible in the absence of some finding of retardation.

5. From 2007 into early 2008, Chaim received regular care, including frequent visits for changes in medication, from Dr. Ambardas at St. Vincent's Hospital. Records submitted contain detailed reports of Chaim's examinations, medications, diagnosis, and prognosis. Unfortunately, however, his (or his parents') medical insurance changed so he is no longer able to avail himself of what appears to have been that excellent treatment.

difficulties.[6] He has been diagnosed with impulsivity, hyperactivity, attention deficit disorder, audio and visual hallucinations, self-mutilating behavior, suicidal gestures and attempts, depression, anxiety, and psychosis. Dr. Ambardas's final report shows a diagnosis as follows:

"Axis I: Depressive disorder N.O.S. - 311

"Psychotic disorder N.O.S. - 298.9

"R/O: R/O MDD w/Psychotic Features

"R/O Schizophrenia, R/o Aspergers

"Axis II: Borderline Intellectual Functioning

"Axis III: Seizure D/O; Asthma; Nose Bleeds."

Her early assessment notes "multiple self-injurious behavior" and "suicidal gestures and attempts." Another evaluator noted:

" 'Emotional state appeared tenuously stable with some indications of overt psychopathology' (Chaim Wakslak, Ph.D. 10/31/07) and [b]ased on background information and behavior observations, it is the opinion of the examiner that Chaim gives evidence . . . consistent with his previous diagnosis of Asperger's disorder" (Young Adult Institute evaluation, Apr. 30, 2009).

The Board of Education Individualized Education Program forms describe Chaim's "disability" as "Emotional Disturbance."

The court's own observation of, and conversation with Chaim suggested intelligence, reasoning and communication skills significantly greater than those of other wards in SCPA article 17-A proceedings carrying diagnoses of mild mental retardation and/or developmental disabilities. At the same time it also indicated (in conjunction with his parents' testimony and the history contained in documents submitted with the petition) serious issues of mental illness.

---

6. In one assessment, his treating psychiatrist ranks Chaim's intelligence as "Average-Below Average" while another assessment notes that, while being tested, "Chaim seemed insecure about his responses to items and often changed his mind. He repeatedly changed correct responses to incorrect responses and insisted that the latter were correct. This behavior was consistent through testing and had a negative impact on Chaim's overall performance." Another report notes: "Testing behavior was characterized by an extremely excruciating process of attempting to engage Chaim in some reasonable repertoire" and concludes: "It is very clear that Chaim is inhibited by what appears to be behaviors consistent with ADHD, a mood disorder, dysthymia, anxiety disorder and oppositional defiance. These conditions result in a curious clinical picture."

Statutory Framework

New York currently provides two distinct statutory schemes under which a personal or property guardian may be appointed for, and exercise power over, a disabled adult:[7] article 17-A of the Surrogate's Court Procedure Act and article 81 of the Mental Hygiene Law. Chaim's parents have chosen to pursue an article 17-A guardianship for several reasons. It is thought to be faster than article 81; petitioners are often pro se, and the combination of simplified forms, service requirements, and assistance by the clerks in Surrogate's Courts mean that a lawyer is not necessary, an important factor for petitioners like those here for whom such an expense is daunting, if not prohibitive. In New York City, at least, most proposed wards have carried diagnoses of mental retardation or developmental disability since early childhood, and they and their families have ongoing relationships with one of the two main organizations, AHRC (Association for the Help for Retarded Children) and YAI (Young Adult Institute), that provide services to the mentally retarded and developmentally disabled communities. Those organizations recommend that parents seek article 17-A guardianship as their children "age out"[8] and often provide information and actual assistance in obtaining guardianship.[9]

---

**7.** As a technical matter, both schemes are also available for minors, but since the law presumes a minor's parents to be her "natural guardian" until she reaches her majority, they are seldom necessary and only rarely utilized. (*But see Matter of Baby Boy W.*, 3 Misc 3d 656, 658 [Sur Ct, Broome County 2004] [article 17-A guardian appointed to make end-of-life decisions for severely mentally retarded month-old infant with "terminal and irreversible" condition].)

**8.** Persons under 21 who have been diagnosed with mental retardation or developmental disability are entitled to educational benefits and services provided by the appropriate education authorities. Upon attaining their majority their entitlements are derived from the State Office of Mental Retardation and Developmental Disabilities and the benefits available to them are substantial. (*See* Mental Hygiene Law § 13.01; *see also* Office of Mental Retardation and Developmental Disabilities Services, http://www.omr.state.ny.us/ws/servlets/WsNavigationServlet [last updated Aug. 20, 2008].) Services available to adults with other kinds of mental disabilities, including mental illness, are significantly harder to come by than those provided by the OMRDD safety net. Thus, the progress from special education to article 17-A guardianship and OMRDD benefits is usually a temporal continuum unavailable to others with different disabilities.

**9.** A staff attorney from AHRC occasionally represents petitioners, and AHRC also has an arrangement with a pro bono initiative at a major New York City law firm.

SCPA article 17-A as originally enacted in 1969 applied to persons with "mental retardation."[10] It was revised in 1989[11] to add to its coverage persons who are "developmentally disabled."[12] Mental Hygiene Law article 81, enacted decades later in 1992, applies to persons whose functional incapacities make the subject of the proceeding—denominated an "alleged incapacitated person" or "AIP"—unable to manage her person or property such that she is both placed in danger and incapable of

---

**10.** Mental retardation is defined in Mental Hygiene Law § 1.03 (21) as "subaverage intellectual functioning which originates during the developmental period and is associated with impairment in adaptive behavior." The American Association of Mental Retardation (AAMR), arguably the leading professional organization in the field of mental retardation, offered the following definition of mental retardation in 2002 in its tenth edition of the AAMR Reference Manual on Definition and Terminology (Luckasson, Borthwick-Duffy, Buntinx, Coulter, Craig, Reeve, et al., Mental Retardation: Definition, Classification, and Systems of Supports, at 23 [2002]): "Mental retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18."

This definition has been widely adopted. It forms the basis for the definition included in the Individuals with Disabilities Education Act of 1990. (See Jack Hourcade, Mental Retardation: Update 2002. ERIC Digest, available at http://www.ericdigests.org/2003-4/mental-retardation.html [accessed Apr. 7, 2009].)

For purposes of article 17-A, a mentally retarded person is defined as a person who has been certified as being incapable of managing himself or herself and/or his or her affairs by reason of mental retardation and that such condition is permanent in nature or "likely to continue indefinitely." (SCPA 1750 [1].)

**11.** See Turano, Practice Commentaries, McKinney's Cons Laws of NY, Book 58A, SCPA 1750-a, at 109.

**12.** A developmentally disabled person is defined in article 17-A as a person who has been certified as having an impaired ability to understand and appreciate the nature and consequences of decisions to such an extent that he or she is incapable of managing himself or herself and/or his or her affairs by reason of such disability. This condition must be permanent in nature or likely to continue indefinitely. The disability must be attributable to: (1) cerebral palsy, epilepsy, neurological impairment, autism or a traumatic head injury, or (2) any other condition of a person found to be closely related to mental retardation because such condition results in similar impairment of general intellectual functioning or adaptive behavior to that of mentally retarded persons; or (3) dyslexia resulting from a disability described in (1) and (2) above or from mental retardation. (SCPA 1750, 1750-a.)

An estimated nine million children and adolescents are affected by developmental or behavioral disorders, including cerebral palsy, autism, and various forms of mental retardation whether genetic (such as Down syndrome and fragile X syndrome) or due to some intrauterine or perinatal insult to the brain. (W. Maxwell Cowan, M.D. and Eric R. Kandel, M.D., Prospects for Neurology and Psychiatry, 285 J Am Med Assn 594 [2001].)

understanding the consequences of her incapacity (*see* Mental Hygiene Law § 81.02 [b] [1], [2]).

As is apparent on the face of the two statutes, article 17-A is almost purely diagnosis driven, while article 81 requires a more refined determination linking functional incapacity, appreciation of danger, and danger itself.[13] This is not the only way in which they differ. The distinctions reflect, at least in part, a decades-long increasing sophistication about mental disabilities as well as an expanding constitutional framework through which the rights of mentally ill persons are protected.

Article 17-A was originally passed, with apparently little discussion, primarily to provide a means for parents of mentally retarded children to continue exercising decision-making power after those children reached age 21.[14] The belief at that time was that mental retardation was a permanent and permanently disabling condition with no realistic likelihood of change or improvement over time.[15] Hence, the same powers that parents held over minors were seen as appropriately continued for the rest of the mentally retarded person's life. The extension of article 17-A to the developmentally disabled in 1989 seems to have evoked a similar lack of comment or study, and apparently included the same assumptions.[16]

By contrast, article 81, which replaces New York's prior "conservator" and "committee" statutes,[17] was the result of several years of study, comment, and public hearings undertaken by the New York State Law Revision Commission, in

---

**13.** The statute quite deliberately rejected a diagnosis driven approach, requiring instead a fact specific determination of an individual's functional incapacities. (*See* Mental Hygiene Law § 81.02 [c], [d] [1].)

**14.** *See Matter of Cruz,* 2001 NY Slip Op 40083(U), *4 (2001); *see also* Lawrence R. Faulkner and Lisa Klee Friedman, *Distinguishing Article 81 and Article 17-A Proceedings,* in 1 Abrams, Guardianship Practice in New York State, at 160 (1997).

**15.** *See* 4 Warren's Heaton, Surrogate's Court Practice § 49.02 (2) (a), at 49-6; § 49.03 (1) (b), at 49-8 (7th ed).

**16.** The medical certifications required for an article 17-A petition require the doctor or other appropriate health care professional to state that the "condition [of mental retardation or developmental disability] is permanent in nature or likely to continue indefinitely." (SCPA 1750 [1]; 1750-a [1].)

**17.** Repealed Mental Hygiene Law article 77 governed conservators of conservatees and repealed article 78 concerned committees of incompetents. Those statutes were characterized by the same "all or nothing" finding, primarily diagnosis driven, as article 17-A, and also implicitly assumed irreversibility. (*See* 4 Warren's Heaton, Surrogate's Court Practice § 50.01 [2], at 50-7 [7th ed].)

response to a national movement to review and rewrite adult guardianship statutes.[18] Article 81, directed primarily at adults who have lost or diminished capacity, begins with the assumption that all adults are fully capacitated, and requires proof of specific incapacity before a guardian can be appointed to remedy the particular proven incapacity. Article 81 anticipates closely tailored guardianships, granting the guardian, whether of the person or property, no more power than is absolutely necessary under the circumstances of the case,[19] and aims to preserve the AIP's autonomy to the greatest degree possible.[20]

Unlike article 81, article 17-A provides no gradations and no described or circumscribed powers. Given a finding of either mental retardation or developmental disability, inability to care for one's self (making no distinctions between what the subject of the proceeding can and cannot do) and the amorphous "best interests standard," a guardian is appointed with seemingly unlimited power,[21] much like the old conservator and committee. There is no statutory guidance as to the extent of this

---

**18.** The movement began with exposes of abuses by the Associated Press in 1987 (*see* Hon. Steve M. King, *Guardianship Monitoring: A Demographic Imperative*, available at http://www.ncpj.org/guardianship%20monitoring.htm [accessed Apr. 17, 2009]) and was largely spearheaded by the ABA Commission on Legal Problems of the Elderly (now the Commission on Law and Aging) which developed guidelines for adult guardianship at a widely attended and highly regarded conference, The National Guardianship Symposium, held at Wingspread Conference Center in 1988. Since that eponymous "Wingspread Conference," 18 states including New York have substantially or entirely revised their adult guardianship statutes, incorporating some or all of the Wingspread recommendations, and all states made at least minor or moderate revisions. (*See* Pamela B. Teaster et al., *Wards of the State: A National Study of Public Guardianship*, available at http://www.abanet.org/aging/publications/docs/wardofstatefinal.pdf [Apr. 2005].)

**19.** Mental Hygiene Law § 81.01.

**20.** Rose Mary Bailly, Practice Commentaries, McKinney's Cons Laws of NY, Book 34A, Mental Hygiene Law § 81.01, at 7 ("[The Legislature] recognized that even when guardianship must be invoked, the authority granted to the guardian should be tailored to the individual's specific needs rather than a 'one size fits all' power, and the authority of the guardian should be limited by those needs").

**21.** Unlike an article 81 proceeding, where the court is obligated to make specific findings on the record and detail the specific powers granted to the guardian (Mental Hygiene Law § 81.15), the court in an article 17-A proceeding simply makes a decree appointing a guardian of the person and/or property. (SCPA 1754 [5].)

power,[22] and surprisingly little case law explication.[23] Because of the wide range of functional capacity found among persons with diagnoses of mental retardation[24] and developmental disability,[25] the powers granted to provide protection to an article 17-A ward may also need to vary, at least to meet the constitutionally mandated standard of least restrictive means.[26]

---

**22.** The provisions of SCPA 1756, which permit appointment of a limited property guardian for an employed person, and which permit that person to retain his wages and to bind himself by contract or to an amount "not exceeding one month's wages . . . or three hundred dollars, whichever is greater," suggest that in other cases persons with article 17-A guardians have no right to contract.

**23.** Courts have, however, imposed limitations where constitutionally protected rights are at stake. A court of the Second Department denied an article 17-A guardian the power to authorize sterilization of his ward because "[n]o statute in New York authorizes this extraordinary procedure, and in the absence of legislative guidelines, determination of such a fundamental right may not be left to the courts on a case-by-case basis" (*Matter of D.D.*, 90 Misc 2d 236, 236 [1977]). And, in *Matter of B.* (190 Misc 2d 581, 585 [Tompkins County Ct 2002]) there is dicta that "[t]he equal protection provisions of the Federal and State Constitutions would require that mentally retarded persons in a similar situation be treated the same whether they have a guardian appointed under article 17-A or article 81."

**24.** Mental retardation is determined by IQ scores, themselves subject to challenge, as illness, motor or sensory impairments, language barriers or cultural differences may hamper a child's test performance (The Merck Manual of Diagnosis and Therapy, Mental Retardation [18th ed 2006] [available at http://www.merck.com/mmpe/sec19/ch299/ch299e.html]). Utilizing the Stanford-Binet scoring instrument, mental retardation begins at an IQ of 70 or less, but DSM-IV notes that due to a generally estimated five-point margin of error in standardized intelligence testing, a person with a measured IQ as high as 75 could be deemed to have met the diagnostic criteria for mental retardation if the requisite functional shortcomings are also noted. (*See* John Parry and F. Phillips Gilliam, Handbook on Mental Disability Law, at 51 [American Bar Association 2002].) The American Association of Mental Retardation emphasizes the importance of moving beyond a primary focus on IQ to a more comprehensive assessment and consideration of deficits in adaptive behavior, without which a diagnosis of mental retardation cannot properly be made. (*Id.*)

Mental retardation can be mild, moderate or severe, with persons in one end incapable of speech or ordinary reasoning, and at the other end, capable of working and living by themselves. (*See* The Merck Manual, Mental Retardation, *supra*.) As noted above at footnote 22, the statute recognizes this variation in part by a provision permitting mentally retarded individuals who work to retain a portion of their wages.

**25.** Developmental disability is even more of a *mot-valise* diagnosis, encompassing such disparate conditions as cerebral palsy and autism, with accompanying variations in levels of physical and mental capacities.

**26.** Due process requires that the least restrictive means be utilized when the state, invoking its parens patriae powers, infringes on an individual's lib-

There are other significant differences between the two statutory schemes, especially procedural:

- A hearing must be held for the appointment of an article 81 guardian, with the right to cross-examination and the right to counsel (Mental Hygiene Law § 81.11 [a], [b]). No hearing is required under article 17-A where the petition is made by or on consent of both parents or the survivor (SCPA 1754 [1]).[27]

- Even when an article 17-A hearing is held, the presence of the allegedly mentally retarded or developmentally disabled person may be dispensed with in circumstances where the court finds the individual's attendance would not be in his or her "best interest" (SCPA 1754 [3]); presence of the subject is presumptively required in article 81 (*see* Mental Hygiene Law § 81.11 [c], [e]; *Matter of Loconti*, 11 AD3d 937 [4th Dept 2004]).

- Article 81 requires the appointment of an independent court evaluator to investigate and make recommendations to the court (Mental Hygiene Law § 81.09); the appointment of a guardian ad litem to perform a similar function is merely discretionary in article 17-A proceedings (SCPA 1754 [1]).

- Almost all article 17-A proceedings are determined by reference to a form "Medical Certification[s] for Appointment of Guardian (SCPA Article 17-A)" which frequently contains conclusory assertions rather than useful information; they are subject neither to cross-examination nor even to the ordinary

erty or property interests for that person's protection. (*See e.g.* Antony B. Klapper, *Finding a Right in State Constitutions for Community Treatment of the Mentally Ill*, 142 U Pa L Rev 739, 759 [1993].)

This standard is specifically incorporated in Mental Hygiene Law § 81.01:
"The legislature finds that it is desirable for and beneficial to persons with incapacities to make available to them the least restrictive form of intervention which assists them in meeting their needs but, at the same time, permits them to exercise the independence and self-determination of which they are capable."

**27.** In certain instances, as where involuntary transfer from the community to a nursing home is sought, counsel is constitutionally required, and where the AIP cannot afford counsel, the city is obligated to provide representation. (*See Matter of St. Luke's-Roosevelt Hosp. Ctr. [Marie H.],* 226 AD2d 106 [1st Dept 1996], *affd* 89 NY2d 889 [1996].)

tests of credibility utilized by a factfinder with a live witness.

- Article 81 requires proof by clear and convincing evidence (Mental Hygiene Law § 81.12 [a]), while article 17-A is silent as to the burden.[28]

Without assessing the constitutionality of these procedural differences, it should be noted that article 81 affords the AIP substantially more procedural protection and, as well, affords the court greater opportunity to make a nuanced determination of the proposed ward's functional capacities and the possible trajectory of her condition.[29] As discussed below, this procedural lacuna is one reason for denying the instant petition.

Finally, the two statutes differ dramatically in the reporting requirements following the appointment of a guardian of the person.[30] Article 81 guardians are mandated to file detailed reports[31] 90 days after appointment and thereafter on a yearly basis, while article 17-A guardians have no duty to and, as a matter of practice, never file *any* report once their appointment has been made.[32] The appointing court thus has absolutely no way of knowing whether a guardianship is still necessary or, of equal importance, whether it continues to serve the ward's best interests.

Early and simplistic assumptions about the permanency and unalterability of mental retardation and developmental disability, on the one hand, and the "natural" obligation and desire of

---

**28.** The only case law found suggests that the usual civil burden of preponderance of the evidence applies. (*See Matter of Jaime S.*, 9 Misc 3d 460 [Fam Ct, Monroe County 2005].)

**29.** Rose Mary Bailly, Practice Commentaries, McKinney's Cons Laws of NY, Book 34A, Mental Hygiene Law § 81.01, at 10.

**30.** Both require annual reports by guardians of the property (Mental Hygiene Law § 81.31; SCPA 1719 [incorporated into article 17-A by SCPA 1761]), though the former is subject to review by statutorily denominated court examiners (Mental Hygiene Law § 81.32), while the requirements for, and subsequent examination of, article 17-A reports of property guardians vary from court to court.

**31.** The 90-day report is intended to inform the court as to whether the guardian has put into place the plan which she proposed prior to appointment, and whether fewer or greater powers are then warranted. The yearly report includes the requirement of a report from medical professionals, as well as information about medications, rehabilitative services and living situation. (Mental Hygiene Law § 81.30; Law Rev Commn Comments, reprinted in McKinney's Cons Laws of NY, Book 34A, Mental Hygiene Law § 81.30, at 344.)

**32.** *See Matter of Stevens*, 17 Misc 3d 1121(A), 2007 NY Slip Op 52097(U) (2007) (SCPA article 17-A provides no continuing oversight of guardians of the person once they have been appointed).

parents to pursue their disabled children's best interests may have provided justification for this lack of judicial oversight in 1966, but those assumptions are highly questionable in light of today's longer life expectancies[33] and advances in medical knowledge.[34] Where the appropriate treatment, with or without medication, is likely to change frequently, and over time, the absence of any continuing judicial oversight raises another red flag about the suitability of article 17-A. Where it appears that the subject's inability to "manage him or herself and/or his or her affairs" is not necessarily attributable to mental retardation or developmental disability, an appointment under article 17-A may not be in the "best interest" of the subject, as the facts in the instant proceeding demonstrate.

Diagnosis of Mental Illness and the "Best Interest" Test

In the vast majority of these cases, there is no question that the proposed ward's disability is the result of mental retardation or developmental disability and that, accordingly, she comes within the purview of article 17-A. Chaim's case is, however, quite different.

While it would be inappropriate for a non-medically-trained court to substitute its own "diagnosis" for that of physicians

---

**33.** For example, because children with Down syndrome seldom lived past their twenties when article 17-A was enacted (*see* American Geriatrics Society, The AGS Foundation for Health In Aging, Aging in the Know, *Mental Retardation*, available at http://www.healthinaging.org/agingintheknow/ chapters_ch_trial.asp?ch=37 [last updated May 31, 2005]), it was reasonable to assume that their parents would outlive them, and continue to provide guardianship for their wards' lifetime. Today with life expectancy for that population greatly enhanced (*see* Diane Lynn Griffiths and Donald G. Unger, *Views About Planning for the Future among Parents and Siblings of Adults with Mental Retardation*, 43 Fam Rel 221 [1994] [increase in the life span of persons with mental retardation]; *see also* National Association of Parents with Children in Special Education, *Mental Retardation*, available at http:// www.napcse.org/exceptionalchildren/mentalretardation.php [accessed Apr. 14, 2009] [older adults with developmental disabilities are living longer than ever before]), it is not uncommon to see article 17-A petitions for mentally retarded persons in their late forties or fifties, where parents are elderly or deceased, and petitioners are siblings, more distant relatives, or even persons not related by blood.

**34.** For example, advances in treatment of autism, included in the broad category "developmental disability," may result in substantial and potentially legally significant increases in functional capacity (*see* Susan Kabot, Wendy Masi, Marilyn Segal, *Advances in the Diagnosis and Treatment of Autism Spectrum Disorders*, 34 Prof Psychol: Res & Prac 26 [2003]; *see also* Sarah Spence and Daniel Geschwind, *Autism Screening and Neurodevelopmental Assessment*, in Autism Spectrum Disorders, at 39 [Eric Hollander ed 2003] [showing increasing evidence that early intervention can improve outcomes]).

and psychologists, the first question presented in an article 17-A proceeding is whether it appears to the satisfaction of the Surrogate's Court that a person is mentally retarded or developmentally disabled, and that the person is incapable of managing herself and/or her affairs *by reason of* that disability (SCPA 1750). Only after such findings are made is the court authorized to appoint a guardian of the person and/or property of such person, and then only if such appointment is in the best interests of the mentally retarded or developmentally disabled person.[35]

Here, although two medical doctors checked boxes on forms that state their "conclusion[s] that the respondent is developmentally disabled" and that "the condition of the respondent is permanent in nature or likely to [continue] indefinitely," the mass of additional information provided, including Dr. Ambardas's detailed records, show a young man with serious psychiatric and emotional problems, including an Axis I diagnosis of Depressive Disorder NOS. It is at least as likely, if not more likely, that Chaim's unquestioned difficulties and "impaired ability to understand and appreciate the consequences of decisions" are due to mental illness rather than developmental disability or mental retardation.

This failure of proof prohibits the appointment of an article 17-A guardian. At the same time, it suggests that an article 81 guardian is more appropriate, given the differences in the statutory schemes. As the reports in evidence demonstrate, without underestimating the difficulties, Chaim's condition is susceptible to medication and he has the potential, if so far unrealized, for a relatively productive and independent life.[36] More significantly, this case illustrates the need for caution in article 17-A proceedings, and the constitutional necessity of strictly confining the provisions of that article to those specific disabilities which it encompasses.

While Chaim may require a guardian, especially, as he himself acknowledges, to make medical decisions, he does not need, nor

---

35. *See* SCPA 1750, 1750-a.

36. The Board of Education's Individualized Education Program assessment of long-term adult outcomes proposes the following goals:
"Chaim will integrate into the community with min. support
"Chaim will attend vocational training program
"Chaim will require support for independent living
"Chaim will be gainfully employed with support."

would it be appropriate to appoint a guardian with total, unfettered power over his life, the only choice available under article 17-A. Further, changes in his circumstances, whether as a result of different or improved medications or otherwise, may require altered powers in the guardian or perhaps even, someday, no guardian at all. The periodic reporting provisions and underlying autonomy-enhancing spirit of article 81 keep these possibilities open to the appointing court, while article 17-A, with its assumption of permanence and unchangeability, does not.

For all these reasons, the petition to appoint an article 17-A guardian of the person for Chaim A.K. is denied without prejudice to commencing an article 81 guardianship proceeding in the appropriate court.[37]

---

**37.** Unfortunately, Surrogate's Court lacks jurisdiction to entertain article 81 proceedings for guardian of the person in any circumstances, and guardian of the property only in narrowly circumscribed circumstances, such as when the incapacitated person is the beneficiary of an estate, or is entitled to proceeds from a wrongful death action or the proceeds of a settlement of a cause of action brought on behalf of an infant for personal injuries. (Mental Hygiene Law § 81.04 [b].) Were there concurrent jurisdiction as, for example, between Family Court and Surrogate's Court in adoptions, the instant proceeding could have been converted after technical service and notice additions were made.