*706 OPINION OF THE COURT
Kristin Booth Glen, S.
This is another in a series of cases that demonstrates the limitations of our current statutory scheme for guardianship of persons with mental retardation and/or developmental disabilities, and that militates for reform of this outdated and unduly restrictive law.
John is 22 years old, with a diagnosis of moderate to severe mental retardation incident to autism. He lives with his parents and siblings, and has been educated at home since the age of 12. With the love and support of his family, and with expert guidance from specialists at Johns Hopkins, John not only has mastered communication and social skills far beyond what might have been expected, but also shows considerable artistic talent. Indeed, his work is of sufficient quality that it has been and — his parents hope — will continue to be sold, generating a small income which they wish to donate to charity.
Because the H. family has considerable means, and because John is the beneficiary of certain trusts, as well as Uniform Gifts to Minors Act (UGMA) accounts, the monies received from the sale of his art are not necessary for his support. John’s parents believe that the charitable contributions make him feel good about himself, so that, in addition to benefitting others, those contributions actually benefit John. As part of their guardianship application,[1] they seek the power to sell John’s work and make such contributions on his behalf from the proceeds.
Laudable as this request is, and inspiring as are John’s artistic accomplishments leading to such request, the court lacks power to grant anything other than a plenary property guardianship which does not include blanket gift-making powers.[2] As noted previously, SCPA article 17-A is a blunt instrument which al *707 lows for none of the “tailoring” that characterizes our adult guardianship statute (Mental Hygiene Law art 81; see Matter of Chaim A.K., 26 Misc 3d 837 [Sur Ct, NY County 2009]).
That statute, for example, specifically provides, where appropriate, that a guardian of the property may make gifts from the funds of the incapacitated person, subject to review by the appointing court (Mental Hygiene Law § 81.21 [a] [1]; [b] [l]-[6]). Where the power to make gifts is sought in an article 81 guardianship proceeding, the petitioner or guardian is required to supply certain information concerning the allegedly incapacitated person’s (AIP) resources and the reasons for, and circumstances surrounding, the proposed gifts. The court must consider, inter alia, “whether the incapacitated person has sufficient capacity to make the proposed [gifts] himself or herself, and, if so, whether he or she has consented to the proposed [gifts]” (Mental Hygiene Law § 81.21 [d] [1]) and may grant the application on a finding that, in the absence of capacity and consent, “a competent, reasonable individual in the position of the incapacitated person would be likely to perform the act or acts under the same circumstances” and the incapacitated person has not previously manifested a contrary intention (Mental Hygiene Law § 81.21 [e] [2], [3]). The court’s grant of the specified gifting power relieves the guardian of the obligation to commence any other special proceeding for authority to make the gifts requested (Mental Hygiene Law § 81.21 [f]).
While recognizing that two prior judges in this court have assumed the power of article 17-A guardians to make gifts, those decisions (both of which involve the same ward) are distinguishable, and, as well, rest on questionable authority. In Matter of Schulze (23 Misc 3d 215 [Sur Ct, NY County 2008] [Schulze II]), the court posed the question as “whether article 81 of the Mental Hygiene Law preempts article 17-A with respect to the authority of guardians to make gifts on behalf of their ward” (id. at 216).[3] The court answered that question in the negative.
Petitioners in Schulze II sought to place virtually all of a guardianship fund in excess of $50 million in a revocable trust that would be governed by article 17-A until the ward’s death (which petitioners had alleged was imminent) such that “the availability of the ward’s funds for her benefit would remain *708 unchanged during the balance of her lifetime” (id.).[4] In granting the petition the court relied on Matter of Schulze (NYLJ, Sept. 3, 1996, at 30, col 1 [Schulze I]) and the cases cited therein.
In Schulze I, the Surrogate was presented with a petition requesting
“permission to make gifts totaling $5,000,000 from [Ms. Schulze’s funds, held pursuant to article 17-A] to trusts for the benefit of her brother’s issue and to pay the gift taxes thereon. Petitioners also [sought] the authority to make yearly annual exclusion ($10,000) gifts to each of the ward’s niece and five nephews without further court approval” (id.).
Relying on eight trial court decisions authorizing guardians to “make gifts on behalf of their wards”[5] 6and a thorough review of the ward’s financial situation and existing and potential needs, the court limited its allowance of immediate relief to $250,000 (from $5 million). The court also noted that “requests to dispense with court-approval each year are not routinely granted” (id.,[6] citing Matter of Daly, 142 Misc 2d 85 [Sur Ct, Nassau County 1988]).[7]
With the exception of Daly, all cases cited in Schulze I (and thus relied upon in Schulze II) involved committees and conservators under the old Mental Hygiene Law, preceding *709 enactment of article 81.[8] Those cases in turn were based on the notion of “substituted judgment,” that is, what the currently incapacitated person would have done before (or in absence of) his incapacity.[9] This demonstrates a critical distinction between guardians for previously capacitated persons and those appointed under article 17-A,[10] where the assumption is that the ward has never had capacity.* [11]
This distinction — and the gift-giving power which flows from it — has its roots in the common law of England, which distinguished between “idiots” (those born without capacity) and “lunatics” (those whose capacity was impaired later in life and who might someday regain it) (see 1 F. Pollock and E Maitland, The History of English Law Before the Time of Edward I, at 481 [2d ed 1911]).[12] The substituted judgment doctrine was developed as a legal fiction by which the King, through Chancery,[13] could obtain funds from the property of a lunatic, and *710 arose from the germinal decision in Ex parte Whitbread in the Matter of Hinde, a Lunatic (35 Eng Rep 878 [Ch Ct 1816]). The holding in Whitbread, and the power it conferred on courts to permit gifts from a lunatic’s estate, was adopted in New York in 1844 in In re Willoughby (11 Paige Ch 257, 260-261 [1844]). The Chancellor cited Shelford’s treatise and Whitbread in upholding the power of an equity court to make allowances to relatives out of a lunatic’s surplus funds, even when those relatives had no claim on the estate, based on the fiction that the court was acting “for the lunatic, and in reference to his estate, as it supposes the lunatic himself would have acted if he had been of sound mind” {id. at 259).
Willoughby was followed in In re Heeney (2 Barb Ch 326 [1847])[14] which is the key case cited in the ALR annotation relied upon in Schulze I. The common-law gloss placed on our committee and conservator statutes, and extended by the legislature into article 81, provides no authority for gift giving in the (historically) very different situation of persons who have suffered from significant intellectual disabilities (“idiots”) from early childhood on, and there is no similar common-law history with regard to such persons, now covered by article 17-A.
The instant case, involving a request for ongoing, blanket power to sell John’s artwork and to make charitable gifts from the proceeds, is thus distinguishable from the majority of cases in which gifting authority was sought on behalf of previously capacitated persons,[15] and from those few in which article 17-A guardians were permitted to make specific, time-limited transfers.
*711 Of at least equal significance, however, this court disagrees that a judge may read into a statute provisions it believes would permit the court to “do justice.”[16] Appealing as this concept may be, it is inconsistent with general principles of statutory construction (see McKinney’s Cons Laws of NY, Book 1, Statutes §§ 73, 74),[17] as well as the constitutional separation of powers.
In 1990 the legislature recognized that article 17-A was due for reconsideration, precisely because of changes in the “care, treatment and understanding of [mentally retarded or developmentally disabled] individuals,” as well as new legal theories and case law relating to the rights of such persons (L 1990, ch 516, § 1), but no action was taken. This court is advised that a coalition of stakeholders, including public interest groups, bar associations, advocates for persons with disabilities, civil liberties organizations and representatives of relevant governmental authorities, have begun work on a proposal to modernize article 17-A, and that the SCPA Legislative Advisory Committee is likewise reexamining the existing law. Just as the limitations— and questionable constitutionality — of the old conservator and committee statutes drove enactment of article 81, so the inability of courts operating under article 17-A to do justice for persons with disabilities in need of some level of guardianship will, hopefully, result in a more progressive, nuanced and protective system of guardianship for this most vulnerable population.
For these reasons, and upon a determination that the relief requested is not available in this proceeding, John’s parents have withdrawn their petition in favor of commencing one under article 81, where tailored guardianship, both of property and the person, appropriate to John’s capacities and circumstances, can be obtained (see Mental Hygiene Law § 81.01 [“(I)t is the purpose of this act to . . . establish^ ) a guardianship system *712 which is appropriate to satisfy either personal or property management needs of an incapacitated person in a manner tailored to the individual needs of that person, which takes in account the personal wishes, preferences and desires of the person, and which affords the person the greatest amount of independence and self-determination and participation in all the decisions affecting such person’s life”]).

. John’s parents seek guardianship of the person, end of life decision-making power pursuant to SCPA 1750-b, the power to place UGMA funds into a supplemental needs trust, and certain other powers relating to existing trusts for John’s benefit.

. The legislature has provided for one form of limited property guardianship, which permits a ward to retain her earnings and to enter into contracts in an amount “not exceeding one month’s wages ... or three hundred dollars, whichever is greater, or as otherwise authorized by the court.” (SCPA 1756.) Such limited guardianship is, however, available only if the proposed ward “is wholly or substantially self-supporting by means of his or her wages or earnings from employment.” (SCPA 1756.) That exception is clearly not available here.

. Whether article 81 was or was not intended to preempt any portion of article 17-A is irrelevant to the ultimate issue: whether article 17-Á encompasses the power to grant the relief requested.

. According to the court,
“The proposed trust device . . . would allow [petitioners, the ward’s brothers and sole distributees,] to channel their presumptive shares from her intestate estate to their charitable organizations in greater amounts than would be the case if such shares went first to them and then, net of estate tax, to such organizations” (id. at 216).

. No appellate authority has been found that permits an article 17-A guardian to make gifts.

. Instead she approved the annual gift-giving authority requested for five years, and only subject to a number of conditions intended to safeguard the ward’s financial well-being.

. Daly is the only other case in which an article 17-A guardian has been assumed to have gift-giving powers. In the face of a request for authorization to make annual tax-free transfers to family members, the court limited its order to authorization for a single year, without prejudice to renewal “in future years” (Daly at 89).

. The Schulze I court also cited an ALR annotation by B.C. Ricketts, entitled Power to Make Charitable Gifts from Estate of Incompetent (99 ALR2d 946 [emphasis added]).

. Significantly, a number of those cases, where gifting was sought to minimize potential estate taxes, saw denial of petitions based on consideration of the ward’s previously executed will and/or estate plan as inconsistent with the proposed gift. (E.g. Matter of Turner v Turner, 61 Misc 2d 153 [Sup Ct, Westchester County 1969].)

. The court in Daly (142 Misc 2d at 88) noted this distinction, but disregarded it, writing that to distinguish between previously capacitated adults and article 17-A wards “would offer [the latter] less opportunity in the law than persons who have come to know a disability later in life. . . . Rather, the court in pursuit of its equitable powers is called upon to do justice.” It is worth noting that the Supreme Court has held that there is reasonable basis for distinguishing between persons with mental illness, and those with mental retardation and/or developmental disability. (Heller v Doe, 509 US 312 [1993].)

. One of the many criticisms of article 17-A is its inability to distinguish functional capacity along the continuum of ability that characterizes persons with mental retardation and developmental disability. (See Matter of Chaim A.K., supra.)

. The earliest legal writing distinguishing between “idiocy” and “lunacy” was the Statute de Prerogativa Regis dating from the late thirteenth century, giving the King control over an idiot’s land, with the only limitation that he would not commit waste or destruction. At the idiot’s death, the estate was rendered to his heirs. The King was afforded much less control over the property of a lunatic, lacking both custody over the lunatic’s land, and any ability to take any profit for his own use. (Louise Harmon, Falling Off the Vine: Legal Fictions and the Doctrine of Substituted Judgment, 100 Yale LJ 1, 16-17 [1990].)

. According to the most influential treatise on the subject, Shelford’s A Practical Treatise on the Law Concerning Lunatics, Idiots, and Persons of Unsound Mind (1833), the King delegated his parens patriae power over *710 infants and idiots to the Chancellor who exercised that power as a matter of equity. As to lunatics, however, the Chancellor’s power was only one of “administration.” (Harmon, Falling Off the Vine: Legal Fictions and the Doctrine of Substituted Judgment, 100 Yale LJ 1, 17-18 [1990].)

. The earlier substituted judgment cases involved “gifting” funds for the maintenance of relatives of the “lunatic,” and the petitioner in Heeney also made a request for such relief. In addition, however, he requested power to make various charitable contributions. Interestingly, the Chancellor wrote, “I cannot authorize the committee to be the almoner of the general charities of the lunatic,” though he authorized modest sums to be placed at the disposal of Mr. Heeney “for small donations, for temporary relief from want and suffering ... in such a way as Mr. Heeney may deem fit” (Heeney at 329).

. This discussion is not intended to assume that John lacks capacity to make decisions or express his views about the relief requested. Because there was no hearing, the court was not able to determine the level or nature of John’s capacities and incapacities. Nor, other than a unitary determination, would article 17-A support such a nuanced approach.

. An exception occurs when such “reading in” is necessary to preserve the statute’s constitutionality (e.g. People v Bailey, 21 NY2d 588 [1968] [reading a hearing requirement into the statute providing indeterminate sentences for sex offenders]; Matter of Rachelle L. v Bruce M., 89 AD2d 765 [3d Dept 1982] [substituting gender-neutral language in Family Ct Act § 532 to avoid constitutional infirmity]), not at issue here.

. Section 73 reads: “The courts in construing a statute should avoid judicial legislation; they do not sit in review of the discretion of the Legislature or determine the expediency, wisdom or propriety of its action on matters within its powers.”
Section 74 reads, in pertinent part: “[T]he failure of the Legislature to include a matter within the scope of an act may be construed as an indication that its exclusion was intended.”