OPINION OF THE COURT
Lee L. Holzman, J.
In this application by the SCPA article 17-A guardians of Joyce’s property, transferred from the Surrogate’s Court, New York County, to this court, the threshold issue is whether this court has authority under the equitable doctrine of substituted judgment to approve the “tax saving” transactions proposed by the petitioners on Joyce’s behalf.
Earlier this year, in Matter of John J.H. (27 Misc 3d 705 [2010]), Surrogate Glen held that under the common law, a court is precluded from exercising substituted judgment on behalf of article 17-A wards who never had the capacity to handle their own affairs. Consequently, that court concluded that the only avenue available for obtaining judicial approval of a gift on behalf of an article 17-A ward is for the petitioners to be appointed guardians under article 81 of the Mental Hygiene Law and then seek gift-giving authority pursuant to section 81.21 of the Mental Hygiene Law. Notwithstanding the scholarly dissertation on the genesis of the doctrine of substituted judgment in England (see Matter of John J.H., 27 Misc 3d at 709-710), for the reasons hereinafter stated, this court holds that, under the law as it presently exists, it has the power to invoke the equitable doctrine of substituted judgment to approve gifts or tax saving transactions on behalf of article 17-A wards.
In previous applications, three different judges of the Surrogate’s Court, New York County, utilized the doctrine of substituted judgment to approve gifts on Joyce’s behalf (see 23 Mise 3d 215 [2008, Roth, S.]; NYLJ, Sept. 3, 1996, at 30, col 1 [Preminger, S.] [also noting that in 1990, Surrogate Lambert approved gifts on Joyce’s behalf]). Although several factors are often relevant in determining whether to approve a gift on behalf of persons who lack the capacity to handle their own af *767 fairs (see Mental Hygiene Law § 81.21 [d] [enumerating five factors together with “such other factors as the court deems relevant”]), such applications are granted “where the wards would not be adversely affected under the circumstances and where the wards themselves would likely make such gifts if they had the capacity to do so” (23 Mise 3d at 217).
Matter of John J.H. (27 Mise 3d at 705) questions the prior judicial approval of gift-giving applications on Joyce’s behalf as well as other authority approving gifts on behalf of article 17-A wards based on the following analysis: (1) it is presumed that the mentally retarded and developmentally disabled persons who have guardians appointed pursuant to article 17-A never had the capacity to handle their own affairs; (2) the doctrine of substituted judgment is rooted in the English common law and applicable only to “lunatics,” i.e., those who once were capable of handling their own affairs, but is inapplicable to “idiots,” those who never had the capacity to handle their own affairs; and (3) section 81.21 of the Mental Hygiene Law enlarged the common law to make the doctrine of substituted judgment applicable to any article 81 ward, regardless of whether the ward was classified under the common law as a “lunatic” or an “idiot.” This analysis led Surrogate Glen to conclude that as article 81 contains a provision expressly authorizing gift giving by fiduciaries for their wards, and article 17-A does not, a court lacks the authority and jurisdiction under either a statute or the common law to allow gift giving on behalf of article 17-A wards.
While there once was a certain philosophical logic in concluding that courts had no basis to employ substituted judgment for one who never possessed any judgment, the equitable doctrine of substituted judgment is a legal fiction, and in the modern era, it makes no practical sense to limit its application based upon an arcane philosophical distinction between the inherent capacities of a “lunatic” and an “idiot.” For the following reasons, this court rejects the notion that it lacks the authority to invoke the doctrine of substituted judgment on behalf of an article 17-A ward: (1) for decades prior to the enactment of article 81 of the Mental Hygiene Law, which was effective on April 1, 1993, New York common law had evolved and courts no longer focused on any threshold distinction between a “lunatic” and an “idiot” before utilizing the doctrine of substituted judgment; (2) instead of abrogating or enlarging New York common law with respect to the doctrine of substituted judgment, sec *768 tion 81.21 of the Mental Hygiene Law codified the common law as it existed at the time of its enactment; and, (3) assuming, arguendo, which this court is not willing to do, that section 81.21 did, to some extent, abrogate or enlarge New York common law, this court would nevertheless still have the authority to consider the same factors enumerated in section 81.21 (d) in determining whether to approve a gift-giving application on behalf of an article 17-A ward.
In Matter of Fairbairn (56 AD2d 259, 264 [1977]), the court noted the expansion of the common-law doctrine with the following observation:
“When the doctrine of ‘substitution of judgment’ originated, there were no gift or inheritance taxes, and so the courts were not asked to consider the tax advantages to an incompetent’s estate of a distribution in her lifetime to the presumptive distributees. With the advent of such taxes they were often treated as a factor in decisions made by the courts as to whether a distribution should be made and the manner thereof’ (citations omitted).
The breadth of the common-law doctrine was expressed by the Court of Appeals in Matter of Hills (264 NY 349, 353-354 [1934]) in the following language:
“A court of equity, through its general jurisdiction over fiduciaries and its function of guardianship of incompetents, may, in proper case, direct the committee to act in behalf of the incompetent in accordance with what the court finds would, in all probability, have been the choice of the incompetent if he had been of sound mind” (citations omitted).
In determining whether the substituted judgment doctrine should be utilized by fiduciaries appointed pursuant to the predecessor statutes to article 81, the New York courts did not focus upon whether the ward would be classified as an “idiot” under centuries old English common law as a threshold issue before holding that the court had the jurisdiction and authority to utilize the substituted judgment doctrine (see Matter of Fairbairn, 56 AD2d at 259; Matter of Garbow, 155 Misc 2d 1001 [1992]; Matter of Florence, 140 Misc 2d 393 [1988]; Matter of Turner v Turner, 61 Misc 2d 153 [1969]; Matter of Myles, 57 Misc 2d 101 [1968]; Matter of Carson, 39 Misc 2d 544 [1962]). Moreover, Matter of John J.H. (27 Misc 3d at 705) is the only case in which a court concluded that it lacked jurisdiction to invoke the doctrine of substituted judgment on behalf of an *769 article 17-A ward (see Matter of Schulze, 23 Misc 3d at 215; Matter of Jackson, NYLJ, Feb. 6, 1997, at 34, col 3; Matter of Schulze, NYLJ, Sept. 3, 1996, at 30, col 1; Matter of Daly, 142 Misc 2d 85 [1988]; Matter of Hymes, 102 Misc 2d 821 [1979]). In fact, in Matter of Schulze (23 Misc 3d at 215), the court expressly rejected the argument that it could not invoke the doctrine of substituted judgment for an article 17-A ward because article 17-A, unlike article 81, contains no express statutory authorization for gift giving. Similarly, in Matter of Daly (142 Misc 2d at 85), the court concluded that the doctrine of substituted judgment was equally available to wards under article 17-A and wards under either the then-existing articles 77 or 78 of the Mental Hygiene Law. This court concurs that there is no evidence of any legislative intent to remove this court’s jurisdiction or power to act on behalf of an article 17-A ward with regard to an issue merely because article 17-A lacks specific provisions with regard to that particular issue while article 81 or one of its predecessors had or has such provisions.
It is germane that in enacting the Surrogate’s Court Procedure Act, the Legislature exercised its “power under § 12(e) of article VI of the Constitution and shall in all instances be deemed to include and confer upon the (surrogate’s) court full equity jurisdiction as to any action, proceeding or other matter over which jurisdiction is or may be conferred” (see SCPA 201 [2]), and that the proceedings enumerated in the SCPA are not exclusive (see SCPA 202). Furthermore, after the appointment of an article 17-A guardian, the Surrogate’s Court may “entertain and adjudicate such steps and proceedings ... as may be deemed necessary or proper for the welfare of such mentally retarded or developmentally disabled person” (see SCPA 1758). Accordingly, there appears to be no reason why the Surrogate’s Court cannot utilize the common law or the criteria set forth in the Mental Hygiene Law (§ 81.21 [d]) to approve a gift on behalf of an article 17-A ward. To hold otherwise requires an article 17-A guardian to incur the expenses and time involved in an article 81 proceeding to be appointed a guardian for the second time. The existing law does not mandate such a result. To the contrary, where it is found to be in the best interests of an article 17-A ward, the courts can employ other provisions of article 81, notwithstanding that the SCPA does not contain a similar, specific provision (see Matter of Mark C.H., 28 Misc 3d 765 [2010, Glen, S.] [the same judge who decided Matter of John J.H., 27 Misc 3d at 705]; and Matter of Yvette A., 27 Mise 3d 945 [2010, Webber, S.]).
*770 The issue remains whether the transactions proposed by Joyce’s four article 17-A guardians, her two brothers, who are her presumptive distributees, an attorney and a financial advisor, should be approved under the doctrine of substituted judgment. The petitioners seek court approval of the following transactions: (1) transferring, without consideration, $200,000 from a revocable trust created for the benefit of Joyce during her lifetime by order of the Surrogate’s Court, New York County, in 2008 (the revocable trust) to an irrevocable grantor trust (the grantor trust) for the benefit of Joyce’s two brothers and their children; and, (2) then transferring assets having a value of approximately $20 million from the revocable trust to the grantor trust in exchange for the grantor trust providing an annual payment to Joyce equal to approximately 5.8% of the value of the transferred assets. The two brothers personally guarantee the annuity payments.
The stated twofold purpose of the application is: (1) permitting the transfer of assets between the revocable and the grantor trusts without incurring any present income tax liability; and (2) reducing estate taxes that are projected to be paid by Joyce’s estate. Although the branch of the proposal providing for a 5.8% annuity payment to Joyce is an excellent rate of return in today’s market, the proposal must be deemed, at least in part, a gift from Joyce to her family both because $200,000 would be transferred from her trust to their trust without consideration and because the stated purpose is to lower the taxes paid by Joyce’s estate to benefit her brothers and their children.
Joyce, who is 59 years old, was born with Down syndrome and has been an SCPA article 17-A ward since 1971. According to the petitioners, she enjoyed a good relationship and visits with her brothers and their children prior to experiencing severe health problems at the end of 2008. The petitioners note that Joyce’s life expectancy is shorter than that of a person who does not suffer from Down syndrome. In support, they annex an affidavit by Joyce’s current doctor, as well as articles which conclude that although individuals with Down syndrome now live longer than ever before, their life expectancy remains shorter than those who do not suffer from the condition.
Joyce comes from a family of considerable means, and the petitioners aver that her individual assets exceed $48 million. Joyce currently resides at an institution in Pennsylvania where she receives continuous nursing care. Between 2004 and 2008, Joyce’s income allegedly exceeded her expenses by approxi-
*771 mately $400,000 to $500,000 annually. Moreover, and although she suffered a major medical setback in December 2008 which increased her annual medical expenses by close to $200,000, her income over the next 10 years is expected to exceed the cost of her care by anywhere between $260,000 to $800,000 if the court denies the application, and significantly more if the court approves the application. Relying on conversations with administrators at the institution concerning projected cost increases over the next 10 years and the purported rate of return for the proposed annuity, the petitioners assert that it is highly unlikely that Joyce’s income ever would be insufficient to meet her needs.
The guardian ad litem appointed for Joyce reports that he is of the opinion that Joyce, if competent, would make the transactions proposed herein in light of the close and loving relationship that she had with her presumptive distributees, her brothers, and their issue, and it is highly unlikely that Joyce will ever have a need for any of the assets that are to be transferred. Specifically, he notes the following: (1) there is the potential for a considerable tax advantage enuring to the ultimate benefit of his ward’s siblings and their issue; and (2) there is “no risk or prejudice to (his) ward” as Joyce still retains approximately $28 million in assets and she will receive approximately $1.3 million annually from the annuity which is guaranteed by her two brothers who collectively have assets of approximately $84.5 million. The guardian ad litem has reviewed and is satisfied with the documents to be executed to carry out the proposal.
Notwithstanding that Joyce previously has made substantial gifts to members of her family and the result of the present proposal is that she will transfer in excess of 40% of the value of her total assets, the court concurs with the conclusion of the guardian ad litem. Specifically, Joyce retains more than sufficient assets to take care of all of her projected needs even in the event that her present medical condition improves and she lives well beyond her life expectancy. Moreover, because Joyce’s brothers are her presumptive distributees and, when her health was better, she enjoyed a close relationship with them and their children, there is every reason to believe that if she were competent, she would want the members of her family to receive the largest amount possible from her estate, provided that she retains more than sufficient assets to meet her own needs.
Accordingly, to the extent applicable to the facts of this application, the court considered the same factors enumerated in *772 section 81.21 (d) of the Mental Hygiene Law and grants the application under the equitable common-law doctrine of substituted judgment.