OPINION OF THE COURT
Kristin Booth Glen, S.
This case presents the opportunity to reconcile an outmoded,[1] constitutionally suspect[2] statute, SCPA article 17-A, with the requirements of substantive due process and the internationally recognized human rights of persons with intellectual disabilities. History
On March 9, 2009, Cruz Maria S. filed a petition[3] for guardianship of her then 29-year-old daughter, Dameris L. The certifications[4] accompanying the petition showed Dameris to have mild to moderate mental retardation, and to be “functioning at the *572 mental age of a seven year old.” She is reported to “have poor receptive and expressive skills — [and, while] ambulatory and able to care for most of her grooming needs, she is highly dependent for all other needs, including medical and financial matters.” At the time Dameris was, sporadically, attending a day adult habilitation program run by AHRC where she was learning, and supervised in, cleaning tasks, particularly cleaning bathrooms.
On March 29, 2009, Dameris married Alberto R. at the Office of the Clerk in Kings County. Alberto had problems of his own, including a history of drug and substance abuse, mental illness and criminal charges.
In mid-May 2009, Cruz came to the court and requested expedited consideration of her petition because, she explained, Dameris was pregnant and due to give birth imminently. A hearing was immediately scheduled for May 20 and, on that date, Alberto appeared and informed the court of his recent marriage to Dameris. It was clear that this was now a struggle over control of Dameris between Cruz, who entirely disapproved of, and distrusted, Alberto, and Alberto, who had the same negative feelings about Cruz. Dameris, very visibly pregnant, showed flat affect, spoke haltingly and in a limited way, and, on all of the evidence adduced at the hearing, appeared incapable of caring for herself and her soon to be born baby.
None of the parties spoke English; both households, Cruz’s and Alberto’s, were supported entirely by government benefits including Supplemental Security Income (SSI).[5] In order to obtain more information about the living situations and caretaking capacities of the contesting parties,[6] the court hastily appointed a guardian ad litem, Raul Garcia, Esq.[7]
After an extremely helpful report from Garcia, the parties returned to court with the primary issue that of responsibility *573 for Dameris and the baby after she gave birth.[8] The court again benefitted from pro bono services, this time from an expert mediator, Edward Bonsignore, Esq. On June 4, 2009, after a full day of mediation, the parties reached an agreement that provided for Dameris to reside with Alberto, but gave Cruz a substantial role after the baby’s birth, and continued contact and visitation at her home. The parties also agreed that, with the court’s approval, Alberto and Cruz would act as co-guardians for Dameris.
The case was adjourned with the guardianship clerk and a court attorney charged with following developments and monitoring the mediation agreement. On June 10, 2009, the baby, Damaris Cruz R, was born at Brooklyn Hospital, and Dameris and Alberto returned with her to Cruz’s apartment. Eventually, with some intermediate stops,[9] and with home care assistance from AHRC, they settled in transitional homeless housing (subsidized by Housing Stability Plus) where, with full-time homemaker services, Dameris, Alberto and the baby were doing well. They returned to court on March 19, 2010, and again on October 5, 2010, when the court formally appointed Cruz and Alberto as co-guardians with Dameris’s consent.[10]
Despite some intermittent problems, things were going relatively well for the R. family until, as a result of the budget crisis, the subsidy program was cancelled, and Dameris and Alberto faced eviction.[11] Cruz was visiting family in the Dominican Republic, as was her custom, and neither Alberto nor the court was able to reach her. Alberto had located rental housing in *574 Pottsville, Pennsylvania, near a cousin, and needed permission to move Dameris and the baby there.
On January 17, 2012, Alberto petitioned to revoke Cruz’s letters as co-guardian, returnable February 9, 2012. Cruz, who was served by substituted service, did not appear. At a special calendar, Alberto presented a proposed lease for a home in Potts-ville, and applications for benefits and services he had filed with Service Access & Management (SAM), a case management and crisis intervention service funded by Schuylkill County.
The court was able to reach the director of SAM by phone, and to fax certain records on file here that were necessary to process the applications. With this assurance, and in the absence of any viable housing alternative in New York, the court temporarily suspended Cruz’s letters and granted permission for temporary relocation to Pennsylvania. Alberto and Dameris were directed to return to court on December 4, 2012, by which time it was expected that Cruz would have returned to New York.
On December 4, 2012, all parties appeared, together with the now almost three-year-old Damaris (nicknamed Chi Chi) and Alberto’s nine-year-old daughter Bianca.[12] SAM was working on obtaining services, but the family was basically functioning on its own, and doing well, utilizing support from Alberto’s cousin, and especially his wife, Margarita, who had previously worked for a different social services agency in Schuylkill County.
Dameris appeared much more confident and dealt appropriately and lovingly with both Chi Chi and Bianca. She revealed that she was, again, pregnant, although she and Alberto also informed the court that she planned to undergo a tubal ligation immediately after the baby was born. Questioned by the court, it was clear that Dameris understood what she had consented to, and why; she explained that she had made her decision after consultation with Alberto, the health care professionals, and Margarita, who had fully explained the procedure to her. Concerned about the availability of homemaking and child care services that Dameris would surely need when the new baby was born, the court continued the hearing to December 12 in order to obtain more information.
*575 On December 12, Cruz, Alberto, Dameris, Chi Chi and Bianca[13] appeared. Because of conflicting appointments on December 11, 2012, Alberto and Dameris had missed a meeting with their social worker, Amy Hessron, so the necessary services were not yet in place. After a call from the court, the appointment with Ms. Hessron was rescheduled for December 18. Alberto and Cruz were directed to return to the court on December 19 for the continued hearing. The now visibly pregnant Dameris was excused. There was, however, opportunity to take testimony about Dameris’s current situation, which proved both enlightening and most encouraging.
Dameris had become friendly with nearby neighbors, who were assisting her in various ways, and whom she and Alberto had asked to serve as the new baby’s godparents. Alberto’s cousin’s wife, Margarita, was a constant presence in the household, explaining and translating for Dameris, and helping her make everyday decisions, as well as more significant decisions such as the tubal ligation. With Ms. Hessron’s assistance, Dameris was enrolled in a literacy class; Hessron had also become part of Dameris’s support network. Cruz and Alberto had resolved most of their difficulties, and the advice and assistance Cruz offered Dameris in frequent phone calls was now welcomed and incorporated. Alberto had shown remarkable resiliency and perseverance settling his family and dealing with a number of health issues for his mother and his two daughters. His relationship to Dameris, while always loving, had clearly evolved, and they now presented as far more of a partnership than as a guardian and his ward.
Between the 12th and the continued hearing on the 19th, the court attorney assigned to the case spoke with Dameris’s prenatal health care provider and with Ms. Hessron.
On the 19th, Cruz and Alberto appeared, accompanied by the prospective godfather, Raul Eusebio, who described his family’s relationship with Alberto and Dameris, and the assistance they were — and intended to continue — providing. The court attorney testified to her conversation with Ms. Hessron, who was working diligently to get Dameris the waiver necessary for postnatal home care services, and who had also reiterated the family’s *576 progress despite considerable obstacles.[14] The court attorney confirmed that Dameris had executed an informal consent to the post-birth sterilization, and that the doctor who took the consent was satisfied that it was both knowing and voluntary.[15] Cruz testified that she would be going to Pennsylvania to help after the baby’s birth, and that she was now satisfied with, and had no concerns about, the relationship between Dameris and Alberto.
Finally, Alberto spoke about what he had accomplished with Dameris over the past eight months in their new home — the progress she had made, what a good job she was doing now with two children, and how together they had found and utilized a support system that was helping them succeed despite all the difficulties they faced. He spoke movingly of his respect for Dameris, and how he understood his role, not as deciding for her, but in assisting her in making her own decisions. At the conclusion of the hearing, for the reasons discussed below, the court terminated the 17-A guardianship of the person of Dameris L. (now R).
Discussion
The family is now fully settled in Pennsylvania, as opposed to the temporary move the court previously authorized. As such, with Cruz suspended, and giving consent to termination of the guardianship, the court no longer has jurisdiction over Dameris. But, even if this were not the case, I would find that guardianship is no longer warranted because there is now a system of supported decision making in place that constitutes a less restrictive alternate to the Draconian loss of liberty entailed by a plenary 17-A guardianship. This use of supported decision making, rather than a guardian’s substituted decision making, is also consistent with international human rights, most particularly article 12 of the United Nations Convention on the Rights of Persons with Disabilities.[16]
*577 A. Least Restrictive Alternative
Beginning with O’Connor v Donaldson (422 US 563 [1975]), substantive due process has been understood to include a requirement that when the State interferes with an individual’s liberty on the basis of its police power, it must employ the least restrictive means available to achieve its objective of protecting the individual and the community. New York courts have embraced the principle of least restrictive alternatives (see e.g. Matter of Kesselbrenner v Anonymous, 33 NY2d 161, 165 [1973] [“To subject a person to a greater deprivation of personal liberty than necessary to achieve the purpose for which he is being confined([17]) is, it is clear, violative of due process”]; Matter of Manhattan Psychiatric Ctr., 285 AD2d 189, 197-198 [1st Dept 2001]).
The legislature, as well, has incorporated least restrictive alternative in liberty curtailing statutes including those dealing with “assisted outpatient treatment” (AOT) (e.g. Mental Hygiene Law § 9.60 [h] [4]; [i] [3] [Kendra’s Law]),[18] and adult guardianship (Mental Hygiene Law § 81.01 [“The legislature finds that it is desirable for and beneficial to persons with incapacities to make available to them the least restrictive form of intervention which assists them in meeting their needs but, at the same time, permits them to exercise the independence and self-determination of which they are capable”]; see Rose Mary Bailly, Practice Commentaries, McKinney’s Cons Laws of NY, Book 34A, Mental Hygiene Law § 81.01 at 7 [2006 ed] [“The Legislature recognized that the legal remedy of guardianship should be the last resort for addressing an individual’s needs because it deprives the person of so much power and control over his or her life”]).
*578 Thus, under article 81, in determining the conditions under which a guardian may be appointed, the court is specifically directed to consider “the sufficiency and reliability of available resources, as defined in subdivision (e) of section 81.03 of this article,[19] to provide for personal needs or property management without the appointment of a guardian” (Mental Hygiene Law § 81.02 [a] [2]). The Law Revision Commission Comments note:
“This definition promotes the goal of the statute of requiring a disposition which represents the least restrictive form of intervention. It is incumbent upon the . . . court to consider voluntary alternatives to judicial intervention under [article 81] . . . The list is not meant to be restrictive but rather set the wheels of investigation in motion for considering what possibly could be done to assist this person without appointing a guardian” (reprinted in McKinney’s Cons Laws of NY, Book 34A, Mental Hygiene Law § 81.03 at 57 [2006 ed]).
To the extent that New York courts have recognized least restrictive alternative as a constitutional imperative (see e.g. Matter of Kesselbrenner v Anonymous, 33 NY2d 161 [1973]; Matter of Andrea B., 94 Misc 2d 919, 925 [Fam Ct, NY County 1978] [“substantive due process requires adherence to the principle of the least restrictive alternative”]), it must, of necessity, apply to guardianships sought pursuant to article 17-A, as well as under the more recent and explicit Mental Hygiene Law article 81. Thus, proof that a person with an intellectual disability needs a guardian must exclude the possibility of that person’s ability to live safely in the community supported by family, friends and mental health professionals.
In order to withstand constitutional challenge,[20] including, particularly, challenge under our own State Constitution’s due *579 process guarantees, SCPA article 17-A must be read to include the requirement that guardianship is the least restrictive alternative to achieve the State’s goal of protecting a person with intellectual disabilities from harm connected to those disabilities. Further, the court must consider the availability of “other resources,” like those in Mental Hygiene Law § 81.03 (e), including a support network of family, friends and professionals before the drastic judicial intervention of guardianship can be imposed.
B. International Human Rights
Article 12 (2) of the United Nations Convention on the Rights of Persons with Disabilities (CRPD) provides that “States Parties shall recognize that persons with disabilities enjoy legal capacity on an equal basis with others in all aspects of life.” As the deliberations that accompanied drafting and passage of the CRPD demonstrated, legal capacity is not only the capacity to have rights, but also the capacity to act on, or exercise, those rights[21] which, the preamble to the CRPD[22] makes clear, includes the right to make one’s own decisions. Recognizing that persons with disabilities may require support to exercise their legal capacity, article 12 (3) requires States Parties to provide access to those supports (see e.g. Robert D. Dinerstein, Implementing Legal Capacity Under Article 12 of the UN Convention on the Rights of Persons with Disabilities: The Difficult Road From Guardianship to Supported Decision-Making, 19 Hum Rts Brief [Issue 2] 8 [2012]) (Dinerstein).
The body created by CRPD to review and comment on compliance by States Parties with the Convention has repeatedly found that guardianship laws that impose substituted decision making on persons with mental and intellectual disabilities violate article 12, and thus the human rights of persons subjected to guardianship.[23]
While the CRPD does not directly affect New York’s guardianship laws, international adoption of a guarantee of legal capac *580 ity for all persons, a guarantee that includes and embraces supported decision making, is entitled to “persuasive weight” in interpreting our own laws and constitutional protections (see e.g. Lawrence v Texas, 539 US 558, 576 [2003]; Johanna Kalb, Human Rights Treaties in State Courts: The International Prospects of State Constitutionalism after Medellin, 115 Penn St L Rev 1051, 1059-1060 [2011]).
As Dinerstein notes,
“The paradigm shift reflected in the move from substitute^] to supported decision making aims to retain the individual as the primary decision maker but recognizes that an individual’s autonomy can be expressed in multiple ways, and that autonomy itself need not be inconsistent with having individuals in one’s life to provide support, guidance and assistance to a greater or lesser degree, so long as it is at the individual’s choosing” (Dinerstein at 10).
The instant case provides a perfect example of the kind of family and community support that enables a person with an intellectual disability to make, act on, and have her decisions legally recognized as, for example, by acceptance of her “informed consent” to a tubal ligation. Because Dameris has such assistance, she is now able to engage in supported decision making, rather than having substituted decision making, in the form of guardianship, imposed upon her by the court.
The internationally recognized right of legal capacity through supported decision making can and should inform our understanding and application of the constitutional imperative of least restrictive alternative. That is, to avoid a finding of unconstitutionality, SCPA article 17-A must be read to require that supported decision making must be explored and exhausted before guardianship can be imposed or, to put it another way, where a person with an intellectual disability has the “other resource” of decision making support, that resource/network constitutes the least restrictive alternative, precluding the imposition of a legal guardian.
Based on all the evidence in this case, Dameris has demonstrated that she is able to exercise her legal capacity, to make and act on her own decisions, with the assistance of a support network which has come together for her since she first appeared in this court. Terminating the letters of guardianship previously granted to Cruz and Alberto recognizes them, instead, as persons assisting and supporting her autonomy, not *581 superseding it. Terminating the guardianship recognizes and affirms Dameris’s constitutional rights and human rights and allows a reading and application of SCPA article 17-A that is consistent with both.

. In 1990, when the legislature was working on reform of the existing adult guardianship laws, then called conservators and committees, it directed the Commissioner of the New York State Office of Mental Retardation and Developmental Disabilities (now the New York State Office for People with Developmental Disabilities) to undertake a study of SCPA article 17-A in light of national guardianship reform efforts and the “momentous changes [that] have occurred in the care, treatment and understanding of these individuals [with intellectual disabilities]” (L 1990, ch 516, § 1). Nothing ever came of that study.

. See e.g. Matter of Mark C.H., 28 Misc 3d 765 (Sur Ct, NY County 2010) (holding statute unconstitutional in the absence of periodic reporting and review, and reading a requirement of same into the law); Matter of Chaim A.K., 26 Misc 3d 837 (Sur Ct, NY County 2009) (criticizing procedural shortcomings of statute as potentially unconstitutional); see Rose Mary Bailly and Charis B. Nick-Torok, Should We be Talking? Beginning a Dialogue on Guardianship for the Developmentally Disabled in New York, 75 Alb L Rev 807, 840 (2011/2012) (“Because SCPA 17-A and MHL 81 had their beginnings at different times, 1969 and 1992 respectively, and with different motivations and approaches to guardianship, they are now tripping over one another. Courts are debating the constitutionality of SCPA 17-A in light of different treatment of individuals under the respective statutes”).

. The petition was sworn to in May 2008, so presumably Cruz began the process prior to Dameris’s involvement with Alberto (see below).

. SCPA 1750-a (1) requires certifications by two health care professionals, whose credentials are spelled out in the statute. In fact, in almost all 17-A proceedings those certifications — that the subject of the proceeding “suffers from” “mental retardation” or “developmental disability,” that such condition began before the age of 22, and that the condition is likely to be permanent — are made by checking boxes on a form “Affidavit (Certification) of Examining Physician or Licensed Psychologist.” Generally there is little or no other information from which the affiant drew her/his conclusions. The statute permits a hearing to be dispensed with if the petition is brought by a par *572 ent or parents, or if the parent(s) consents (SCPA 1754 [1]). Even where, as in New York County, hearings are held in all cases, use of the form affidavits completely eliminates any possibility of cross-examination.

. At the time Alberto was living with his mother, also on SSI.

. Alberto opposed Cruz’s petition, but did not actually file a cross petition until much later. Dameris was, however, apparently living with him in Brooklyn, and part of Cruz’s “plan” of guardianship was to bring her home to Cruz’s apartment in Washington Heights.

. Garcia, who is Spanish speaking, served without fee and provided extraordinary assistance to the court in a very compressed period of time. He, and the firm for which he worked, O’Dwyer and Bernstien, deserve the gratitude of the court.

. There was significant concern that the baby might be taken from the hospital by Child Welfare Services, and Lynn Paltrow, director of National Advocates for Pregnant Women, attended the first two hearings as a potential resource.

. For a time they lived with Alberto’s mother, and when that became untenable, they were temporarily placed in a homeless family shelter before obtaining a subsidized two-bedroom apartment under the Emergency Assistance Rehousing Program. The unavailability of affordable housing in New York City has been a continuing issue for this family which has led, on two separate occasions, to proposals to leave the city and state.

. At the October hearing, Dameris was considerably more engaged, perhaps as a result of the success she was experiencing as a mother. She was also much more verbal, agreed that she needed help in making decisions, and stated that she was willing to have Alberto and her mother as her co-guardians. It is this court’s experience that guardianship on consent is not only autonomy-enhancing, but also generally results in greater cooperation between the guardian(s) and the “ward.”

. The rent was $1,070 per month, and, without the City subsidy, exceeded the total benefits received by both Alberto and Dameris from SSI.

. Bianca is the child of a relationship prior to Alberto’s marriage to Dameris, and initially lived with her mother, but when custody was removed she was placed with her grandmother, Alberto’s mother. Subsequently the grandmother, her husband and Bianca also moved to Pottsville, but with the grandmother’s worsening health and her husband’s death, Alberto took custody of Bianca, and she came to live with him, Dameris, and Chi Chi.

. Bianca, a bright and charming child, explained that she was not missing a “real” school day, but rather a pageant, and proudly described how well she was doing in school.

. Primary among these is the paucity of Spanish speakers in Schuylkill County, including health care providers, educators and service providers. Alberto is the primary translator, but Dameris is now learning English in her literacy class.

. Interestingly, the health care provider, Comprehensive Women’s Health Services, did not require Alberto’s consent, as guardian, to the procedure, but rather took and accepted the consent given by Dameris.

. United Nations Convention on the Rights of Persons with Disabilities, UN General Assembly resolution 61/611 (Dec. 13, 2006), available at http:// www.un.org/disabilities/convention/conventionfull.shtml (accessed Dec. 27, 2012).

. Most of the early least restrictive alternative cases involved some form of involuntary confinement, but the more general principle applies equally to lesser deprivations of liberty, including guardianship. See discussion of Mental Hygiene Law article 81, below.

. See Matter of Manhattan Psychiatric Ctr., 285 AD2d at 197 (noting the “underlying concern of the Legislature in enacting Kendra’s Law, i.e., to place as few restrictions as possible on the liberty of persons who, though suffering from mental illnesses, are capable of living in the community with the help of family, friends and mental health professionals [L 1999, ch 408, § 2 . . . ]” [internal quotation marks omitted]); see e.g. Kendra’s Law: The Process for Obtaining Assisted Outpatient Treatment, OMH Q, Dec. 1999 at 4-6 (Kendra’s Law requires that AOT be the least restrictive alternative); Ilissa L. Watnik, Comment, A Constitutional Analysis of Kendra’s Law: New York’s Solution for Treatment of the Chronically Mentally III, 149 U Pa L Rev 1181, 1199-1204 (2001) (discussing due process imperatives incorporated in the statute).

. Section 81.03 (e) defines “available resources” as meaning “resources such as, but not limited to, visiting nurses, homemakers, home health aides, adult day care and multipurpose senior citizen centers, powers of attorney, health care proxies, trusts, representative and protective payees, and residential care facilities.”

. There is also a potential equal protection challenge if the least restrictive alternative provisions of Mental Hygiene Law article 81 are not read into SCPA article 17-A (see Matter of B., 190 Misc 2d 581, 585 [Tompkins County Ct 2002] [“The equal protection provisions of the Federal and State Constitutions . . . require that mentally retarded persons in a similar situation be treated the same whether they have a guardian appointed under article 17-A or article 81” (citing Cleburne v Cleburne Living Center, Inc., 473 US 432 [1985])]).

. See discussion of the debates and ultimate adoption of the more expansive definition of legal capacity in Amita Dhanda, Legal Capacity in the Disability Rights Convention: Stranglehold of the Past or Lodestar of the Future? (34 Syracuse J Int’l L & Com 429, 442 [2007]).

. CRPD preamble (n) (recognizing “the importance for persons with disabilities of their individual autonomy and independence, including the freedom to make their own choices”).

. See e.g. Dinerstein at 11-12; Kristin Booth Glen, Changing Paradigms: Mental Capacity, Legal Capacity, Guardianship, and Beyond, 44 Colum Hum Rts L Rev 93 (2012) (collecting decisions on Tunisia, Spain and Peru).