OPINION OF THE COURT
Margarita López Torres, S.
This is a proceeding brought by Ms. D. and M.D. (collectively, the petitioners) to be appointed the coguardians of the person of D.D. pursuant to article 17-a of the Surrogate’s Court Procedure Act. Ms. D. is D.D.’s mother and M.D. is one of D.D.’s brothers. Petitioners also seek the appointment of W.D. and A.D., D.D.’s brothers, as standby guardian and alternate standby guardian, respectively. The petitioners are represented by counsel.
Statutory Framework
SCPA article 17-a governs guardianship of persons who are intellectually or developmentally disabled. This court uses the term “intellectual disability” in lieu of “mental retardation” even though SCPA utilizes the latter to describe the same condition. This change in terminology has been approved and used in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM), one of the standard texts used by psychiatrists and mental health professionals in classifying mental disorders. (See Hall v Florida, 572 US —, —, 134 S Ct 1986, 1990 [2014], citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders at 33 [5th ed 2013].)[1]
An intellectually disabled person is defined by SCPA 1750 as one who is permanently or indefinitely incapable of managing oneself and/or one’s own affairs because of an intellectual dis *668 ability. The condition must be certified by a licensed physician and a licensed psychologist or by two licensed physicians, one of whom has familiarity with or knowledge of the care and treatment of persons with intellectual disabilities. It must appear to the satisfaction of the court that the best interests of such person will be promoted by the appointment of a guardian. (SCPA 1754 [5].)
A developmentally disabled person is defined by SCPA 1750-a as one who has an impaired ability to understand and appreciate the nature and consequences of decisions which result in one’s incapacity to manage oneself and/or one’s own affairs. The developmental disability must be permanent or indefinite and attributable to cerebral palsy, epilepsy, neurological impairment, autism, traumatic brain injury, or any condition found to be closely related to intellectual disability. The condition must have originated before the age of 22, except for traumatic brain injury which has no age limit. As with SCPA 1750, the condition must be certified by a licensed physician and a licensed psychologist or by two licensed physicians, one of whom has familiarity with or knowledge of the care and treatment of persons with developmental disabilities. Also as with SCPA 1750, the court must determine that it is in such person’s best interest that a guardian is appointed. (SCPA 1754 [5].)
The legal determination of the need for guardianship is functionally the same whether an individual’s disability is categorized under section 1750 or 1750-a of SCPA and relies upon the same body of law. Under article 17-a, appointment of a guardian of the person of an intellectually disabled individual wholly removes that individual’s legal right to make decisions over one’s own affairs and vests in the guardian “virtually complete power over [such individual]” (Matter of Mark C.H., 28 Misc 3d 765, 776 [Sur Ct, NY County 2010]). In order to support this immense loss of individual liberty, the petitioners bear the burden of proving, to the satisfaction of the court, that the appointment of a guardian is necessary and in the best interest of the person with intellectual disability or developmental disability. (SCPA 1750, 1750-a; Matter of Maselli, NYLJ, Mar. 29, 2000 at 28, col 4 [Sur Ct, Nassau County 2000].) The extreme remedy of guardianship should be the last resort for addressing an individual’s needs because “it deprives the [individual] of so much power and control over his or her life” (Matter of Dameris L., 38 Misc 3d 570, 577-578 [Sur Ct, NY County 2012] [“To the extent that New York courts have *669 recognized least restrictive alternative as a constitutional imperative, it must, of necessity, apply to guardianships sought pursuant to article 17-A” (citations omitted)]). If there are less restrictive alternatives that are sufficient and reliable to meet the needs of the person, guardianship is not warranted. (Matter of Guardian for A.E., NYLJ, Aug. 17, 2015 at 22, col 4 [Sur Ct, Kangs County 2015].)
The term “best interest” has been aptly described as “amorphous” (see Matter of Chaim A.K., 26 Misc 3d 837, 844-845 [Sur Ct, NY County 2009]) and the criteria necessary to support a finding that appointment of a guardian is appropriate in a particular case are rarely articulated but frequently assumed. (Matter of Udwin, NYLJ, June 11, 2013 at 31 [Sur Ct, Kings County 2013].) Understanding the functional capacity of an individual with disability, what an individual can or cannot do, is a necessary inquiry in determining best interest and the necessity of guardianship. This is especially true in light of the emerging awareness that there is a wide range of functional capacity found among persons with diagnoses of intellectual disability and developmental disability. (Chaim, 26 Misc 3d 837.) As such, the perfunctory removal of decision-making rights from persons with cognitive limitations is increasingly disfavored. The New York State Legislature recognized this shift when it amended article 17-a in 1990, noting
“[S]ince this statute was enacted in 1969, momentous changes have occurred in the care, treatment and understanding of these individuals. Deinstitutionalization and community-based care have increased the capacity of persons with mental retardation and developmental disabilities to function independently and make many of their own decisions. These . . . rights and activities which society has increasingly come to recognize should be exercised by such persons to the fullest extent possible.”[2]
In order to identify “the least restrictive alternative [to guardianship] to achieve the State’s goal of protecting a person with intellectual disabilities from harm connected to those disabilities,” an inquiry into the availability of resources to assist the individual, including a support network of family, friends, *670 and supportive services, is required. (Matter of Dameris L. at 579.) Indeed, “proof that a person with an intellectual disability needs a guardian must exclude the possibility of that person’s ability to live safely in the community supported by family, friends and mental health professionals.” (Id. at 578.)
“SCPA article 17-A must be read to require that supported decision making must be explored and exhausted before guardianship can be imposed or, to put it another way, where a person with an intellectual disability has the ‘other resource’ of decision making support, that resource/network constitutes the least restrictive alternative, precluding the imposition of a legal guardian.” (Id. at 580.)
Before “the drastic judicial intervention of guardianship can be imposed,” which completely supplants the decision-making ability of the individual with disability, guardianship “may be granted only if it is the least restrictive alternative to achieve the goal of protecting a person with a mental disability” (Matter of Guardian for A.E., NYLJ, Aug. 17, 2015 at 22, col 4 [Sur Ct, Kings County 2015]).
Record Presented
Testimony was presented by both petitioners and D.D. during the hearings held on August 26, 2014, and March 27, 2015. In support of their petition, the petitioners submitted documentary evidence consisting of reports from a psychosocial assessment conducted on April 15, 2014, and a psychological evaluation conducted on October 31, 2013 (collectively, the reports), in addition to certifications from two licensed physicians (the certifications). A guardian ad litem was appointed and a report containing her findings and recommendations was filed.
The record reflects that D.D. is a 29-year-old adult and, according to a certification, diagnosed with “Down Syndrome with Low Mild MR.” The psychological evaluation of D.D. revealed that on the Wechsler Adult Intelligence Scale—Fourth Edition, a test used to measure intellectual functioning, D.D. scored 68 in processing speed, 60 in working memory, 58 in verbal comprehension, and 56 in perceptual reasoning, for a composite full scale IQ score of 54, indicating cognitive ability in the mild range of intellectual disability. On the Vineland Adaptive Behavior Scales, which measure everyday living skills, D.D. has an Adaptive Behavior Composite score of 70. *671 The two physicians’ certifications[3] state, in a conclusory manner in a preprinted form, that by reason of his intellectual disability, D.D. is not capable of managing himself and appreciating the nature and consequences of health care decisions, and of reaching an informed decision to promote his own well being.
The comprehensive psychosocial report based on an evaluation of D.D. on April 15, 2014, reveals
“[D.D.] is friendly, funny, engaging and charming man who presents as self confident and inquisitive . . . [D.D.] is a wonderful storyteller and has an excellent memory for detail . . . [D.D.] communicates effectively with good vocabulary and complex sentence structure . . . [He] displays a sensitivity towards others and expressed concern for those he loves . . . [D.D.]’s entire family embraces and supports him; they live fairly close by and see one another regularly . . . He shares a close relationship with his brothers . . . [D.D.] has three young nieces and enjoys spending time with them. Mrs. [D.] remarked on how good he is with assisting in the care of his nieces . . . [D.D.] was proud to tell me that he is the godfather for one of his nieces.”[4]
During the evaluation, D.D. spoke often about his father, who died unexpectedly in 2011. D.D. stated he was “thick headed” like his father, but “I get my charm from my father too!” D.D. is protective of his mother “and wants to make sure that she doesn’t work too hard or do too much.” The psychological report based on an evaluation of D.D. on October 31, 2013, concludes “[D.D.] appears to be doing well in his current program and current supports appear appropriate.”[5] Said report recommended D.D.’s continued participation in his current work program and continued enhancement of his independent living skills and work skills. None of the reports specifically address D.D.’s capacity to engage in informed medical consent or to make medical decisions. No medical or mental health professionals testified.
*672 The record reflects that D.D. is able to work, both through enrollment in a supportive work program run by the Guild for Exceptional Children (the Guild) and at a restaurant in Brooklyn. Through the Guild program, D.D. works, under supervision, at various Petco stores and at Kingsborough Community College on a volunteer basis, where his responsibilities include cleaning tables, removing labels from shelves, collapsing cardboard boxes, and preparing for recycling and sanitation pickup. D.D. also works at Gargiulo’s Restaurant in Brooklyn, where he has worked for several years mainly as a busboy. He has also served from the buffet table, passed hors d’oeuvres, and helped set up tables during catered functions. He works Saturday shifts “whenever they need me” and is paid in wages and in tips. According to other employees at the restaurant, D.D. is well liked, “is good at his job, does not need extra help, and never forgets a face.” A supervisor at the restaurant opined that she believed “[D.D.] is capable of working there 20 to 30 hours a week because he has no physical impairments and works well.” When asked if he would like to work more, D.D. seemed reluctant, testifying that he likes to do other things on Sundays.
D.D. has an active social schedule involving family, friends, and participation in recreational programs. D.D. bowls, takes karate lessons, plays sports, skis, and is an altar server at his church. In addition to Guild related activities, D.D. belongs to Rockaway Beach Special Athletes, an adaptive sports program that meets on Monday evenings.
D.D. is able to travel independently to familiar destinations using public transportation. On a daily basis he walks by himself to the Guild’s Fischetti Center, an approximately 15-minute walk from his house. D.D. possesses and uses a phone and cell phone to make and receive calls. He knows what to do in the event of an emergency. He tells time and uses the computer for games and to access the Internet.
D.D. is independent in his personal care and hygiene. He is able to bathe, shave and dress himself. Ms. D. testified that D.D. sometimes needs to be reminded to brush his teeth, which he does not enjoy. He assists at home with different chores, including taking out the garbage, setting and clearing the table, loading and unloading the dishwasher, making his bed and keeping his room in order. He sets his alarm, gets himself up and ready in the morning. He packs his lunch, taking care to wrap his bottles of water and fruit in aluminum foil, but prefers *673 that his mother make his sandwich. Ms. D. does the cooking at home and, while she testified that she has not given D.D. the opportunity to cook, she felt he did have the capability. At the Guild, D.D. is provided training in food preparation.
D.D. is healthy, has had no medical complications or serious health issues, and does not take any prescription medication. D.D. does use a cream to treat foot fungus. Ms. D. believes he is not capable of making medical decisions. In support of her position that D.D. is in need of a guardian who will ensure he makes good medical decisions, she testified that one time, D.D. hurt his ankle and she took him to the orthopedist. The orthopedist recommended that D.D. wear an ankle brace for two to three weeks, which D.D. did. At the end of that period, D.D. continued to wear the ankle brace and did not want to take it off. Only after D.D.’s work supervisors at the Guild spoke with him did D.D. decide to remove the brace. There were no other medical incidents about which testimony was given.
D.D.’s main source of income is from Social Security, for which Ms. D. is his representative payee. She testified that she manages his finances and they have a joint checking account. D.D. contributes to the expenses of the household. D.D. also keeps some cash for spending money. He makes purchases and can identify money, but testified that he doesn’t count his change. Ms. D. and M.D. testified that on two occasions a few years ago, they were concerned that D.D. would not tell them how he spent his spending money. They fear someone will take advantage of D.D. in a financial situation. When asked if he would sign a contract if a stranger offered him money, D.D. testified unequivocally that he would not. D.D. has never been shown how to use the ATM machine or, aside from a lesson in high school, write a check. When D.D. wishes to spend money from his bank account, he and Ms. D. have a discussion and she will write a check for him. There was no testimony or evidence presented that D.D. is incapable of learning how to use an ATM machine or write a check.
D.D. testified he would someday like to get married and have a family. He has a girlfriend named Janice and is saving up for an engagement ring. Ms. D. does not support D.D.’s desire to marry Janice. At the hearing, Ms. D. testified adamantly that she is opposed to D.D. marrying at all. She testified “[i]f a child were to come of the union, that child would have Down syndrome. I have concerns about who would take care of that *674 child. I don’t feel [D.] and Janice are capable of taking care of her.” In the guardian ad litem report, it states, “Ms. [D.] thinks Janice is too pushy and said she would never give her blessing to a marriage between [D.D.] and Janice.”
In court, D.D. testified that he wants Ms. D. and M.D. to be appointed his guardians. However, when the guardian ad litem interviewed D.D. outside the presence of his mother and M.D., D.D. declared that he did not want a guardian. The guardian ad litem reports, “[d]uring our home visit on March 2, 2015, [D.D.] expressed his desire to make his own decisions about healthcare, moving out on his own, and marriage.” In any event, D.D.’s preference with respect to guardianship is not controlling on the issue of whether guardianship is appropriate and does not supplant the court’s function to determine if a need for guardianship pursuant to SCPA article 17-a has been satisfactorily demonstrated and is in his best interest.
The guardian ad litem interviewed Ms. D., M.D., D.D.’s other two brothers, D.D.’s primary care physician, Medicaid service coordinator, social worker, psychologist, supervisor at the Guild, and employees of Gargiulo’s Restaurant. As a result of her investigation, the guardian ad litem reports that D.D. appears to be capable of making his own decisions albeit with the help and support of his family, those close to him, and his supportive services. She further reports that given his history of consulting with family before making significant decisions, guardianship is not appropriate. It is the recommendation of the guardian ad litem that D.D. is not in need of a guardian. The guardian ad litem recommends alternatives to guardianship, such as a durable power of attorney and health care proxy, to meet any financial and health care concerns expressed by petitioners and if desired by D.D.
M.D. testified that they wish to protect D.D. with making health care decisions, finances, and “protecting him from somebody else, without his best interest at heart, having him do something that [is] not in his best interest.” Ms. D. testified that D.D. needs help with finances and medical decisions and it would be good for him to have someone to talk to, that she was looking toward the future more than the present and worries that someone down the line will take advantage of him.
Based upon the documentary proof proferred, the oral testimony presented at the hearings, the report of the guardian ad litem, and the personal appearance and demeanor of D.D., the court finds that the petitioners have failed to suf *675 ficiently demonstrate that the appointment of an article 17-a guardian for D.D. is necessary and in his best interest.
D.D. presents as a capable, thoughtful and engaging adult with mild intellectual disability who is high functioning, well integrated socially, able to work, to travel independently, to exercise self-care and management, and to make decisions about his own affairs, albeit at times with assistance and supervision from his family and supportive programs. The petitioners’ contention that D.D. is unable to make medical decisions is unsupported by the record. On the contrary, it appears that D.D. makes decisions, including those affecting his health, in consultation with the people he trusts, and there is no evidence presented in the psychological and social evaluations of D.D. to substantiate petitioners’ contention that D.D. is incapable of making medical decisions. There is also no evidence presented that D.D. is incapable of making financial decisions. There is no indication that, if taught, D.D. would not be able to use an ATM or write checks. To the extent that D.D. may require assistance with more complex fiscal matters, that need has been largely met by D.D.’s designation of Ms. D. as his representative payee. Ms. D. already manages D.D.’s primary source of income and their joint account.
To the extent needed, alternate, less restrictive legal tools, such as a power of attorney, may be utilized to handle other financial matters, and advance directives, such as a health care proxy, may be utilized to allow family members to make medical decisions for D.D. when he is no longer able to do so. D.D. may also authorize his physicians to speak with his family and those he trusts to discuss his medical needs, which he appears to have already done. Furthermore, a wide range of services, some of which it appears D.D. already utilizes, are offered by the Office for People with Developmental Disabilities to support individuals with intellectual disabilities, such as supportive housing, including supervised semi-independent living options, adaptive skill development, adult educational programs, vocational training, community inclusion and relationship building, and self-advocacy, informed choice and behavioral skills development.[6] These alternative resources enable individuals with disabilities to maintain as much control over their own life decisions as they are capable to make in the least restrictive setting.
*676 Finally, D.D. presents as a young man who aspires to someday do what many people desire—to marry. The strong objection of the proposed guardian Ms. D. to D.D. ever marrying raises concerns. As most recently articulated by the United States Supreme Court in Obergefell v Hodges, “[r]ising from the most basic human needs, marriage is essential to our most profound hopes and aspirations” (576 US —, —, 135 S Ct 2584, 2594 [2015]). “[T]he right to marry is of fundamental importance for all individuals” (Zablocki v Redhail, 434 US 374, 384 [1978]) and “has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free [people]” (Loving v Virginia, 388 US 1, 12 [1967]). This is no less true for D.D., a young man who has expressed that, like his brothers, he wants to marry and have a family. The right “to marry, establish a home and bring up children” is a central part of liberty protected by the Due Process Clause. (Meyer v Nebraska, 262 US 390, 399 [1923].) “We deal with a right of privacy older than the Bill of Rights—older than our political parties, older than our school system. Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred” (Griswold v Connecticut, 381 US 479, 486 [1965]). The right to have children is “a right which is basic to the perpetuation of a race” (Skinner v Oklahoma ex rel. Williamson, 316 US 535, 536 [1942]). The right to have a family of one’s own is not reserved only for persons with no disabilities, and the yearning for companionship, love, and intimacy is no less compelling for persons living with disabilities. D.D. desires to choose whom he loves, to marry, to establish a home, and, perhaps, to bring up children some day; these are choices central to his personal dignity and autonomy and his pursuit of happiness, and they are his to make.
The petitioners believe that they know what is best for D.D. and can provide him with excellent care and guidance in the event he needs it. There is no doubt that the petitioners deeply love and are devoted to D.D. and are motivated by what they believe is in his best interest. However, the standard here is not whether the petitioners can make better decisions than D.D., it is whether or not D.D. has the capacity to make decisions for himself with the support that he abundantly has. (Matter of Rupper, Sur Ct, Kings County, Dec. 9, 2011, Lopez Torres, S., file No. 2011-783.)
*677 Conclusion
The loving and supportive environment in which D.D. is enveloped has enabled him to thrive despite his limitations. It has not been demonstrated to the satisfaction of the court that guardianship pursuant to article 17-a is the least restrictive means to address D.D.’s needs where the presence of supported, instead of substituted, decision-making is available for D.D. It is evident that D.D. seeks advice and direction from his loving family before making significant decisions, and nothing in this court’s ruling precludes D.D. from continuing to do so, nor does it preclude his family members from continuing to be involved in his medical and financial decisions. The network of supported decision-making provided D.D. that has characterized the past 11 years of his adulthood has yielded a safe and productive life where he has thrived and remained free from the need to wholly supplant the legal right to make his own decisions.
It has not been sufficiently demonstrated that D.D. is a person in need of a guardian pursuant to SCPA article 17-a and that it is in his best interest to have a guardian appointed for him. Accordingly, the petition for the appointment of a guardian of the person is dismissed.

. The shift away if ora usage of “mental retardation” is reflected in federal statutes (see Pub L 111-256, 124 US Stat 2643 [111th Cong, Oct. 5, 2010] [termed “Rosa’s Law”] [all references in federal law to “mentally retarded individual” are changed to “individual with an intellectual disability”]). New York has renamed its “Office of Mental Retardation and Developmental Disabilities” to “Office for People With Developmental Disabilities.”

. L 1990, ch 516, § 1, reprinted in McKinney’s Cons Laws of NY, Book 58A, SCPA 1750, Historical and Statutory Notes at 427 (2011 ed).

. These certifications are boilerplate forms that include sections where the affirmant checks off preprinted conclusions relating to the decision making capabilities of an intellectually or developmentally disabled individual. The court has found the certifications wanting in useful information and requires, at a minimum, psychological and psychosocial evaluations as well as the individualized education program (IEP).

. Comprehensive Social Evaluation of D.D., Guild for Exceptional Children.

. Psychological Evaluation of D.D., Guild for Exceptional Children.

. See New York State Office for People With Developmental Disabilities, http://www.opwdd.ny.gov/opwdd_services_supports (accessed Oct. 13, 2015), for a description of services available to persons with disabilities.