**Matter of Solomon R.S.**

2025 NY Slip Op 31361(U)

April 15, 2025

Surrogate's Court, New York County

Docket Number: File No. 2023-1635

Judge: Hilary Gingold

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------------X

In the Matter of the Application for Guardianship of

SOLOMON R.S.,

Pursuant to SCPA Article 17-A.

-----------------------------------------------------------------------X

DECISION

File No. 2023-1635
2023-1635/A

G I N G O L D, S.

In this contested proceeding, Claudia M.S., the mother of Solomon R.S. (Respondent), and Jeffrey L.S., the Respondent's father, have each petitioned to be appointed the Respondent's sole guardian of person pursuant to Article 17-A of the Surrogate's Court Procedure Act (SCPA).

Background

On April 26, 2023, the Respondent's mother filed a petition, as a *pro se* litigant, whereby she seeks her appointment as her son's sole primary guardian of the person, including the authority to make decisions on life-sustaining treatment as defined in SCPA 1750-b (1). She further seeks the appointment her sister (Respondent's maternal aunt), a domiciliary of the State of Massachusetts, as the standby guardian of his person.

Shortly thereafter, on May 18, 2023, the Respondent's father cross-petitioned, under representation of counsel, seeking his appointment as his son's sole primary guardian of the person, also with the authority to make decisions on life-sustaining treatment. He further seeks the appointment of his brother (Respondent's paternal uncle), a domiciliary of the State of New Jersey, as the standby guardian of his person.

The parties live apart due to their pending divorce, which is discussed in more detail below. The Respondent's mother remains a domiciliary of New York County. His father clarifies in his

[* 1]

cross-petition, as amended, that his primary residence is in New York County but that he has a second residence in New Jersey. Neither parent has any indicated reports of child abuse or maltreatment with the State Central Register, and neither has any criminal history.

Respondent is a 19-year-old young man that has been diagnosed with developmental and intellectual disabilities. Specifically, he was diagnosed with autism at around 18 months of age, and suffers from seizure disorder (more prevalent in his childhood but with recurrences in 2015 and 2023), epilepsy, growth hormone deficiency, and sleep disorder.

His mother's petition includes the certification of Dr. Dana Price (Dr. Price), a pediatric neurologist and the Director of NYU Langone's Angelman Syndrome Clinic and its CDKL5 Deficiency Disorder Center of Excellence at the Comprehensive Epilepsy Center. Dr. Price's evaluation of Respondent indicates that he 'remains at risk of injury and elopement as he has no sense of danger, severe impulsivity, and no self-regulation. He is unable to respond to questions and commands appropriately.'

Both the petition and the cross-petition include a certification from Respondent's pediatrician, Dr. Audrey Olivera Schwabe (Dr. Olivera), who is affiliated with Weill Cornell Medicine. Dr. Olivera explains that Respondent has a 'low IQ' and that he is essentially non-verbal due to his cognitive and communication delays, relying on an augmentative and alternative communication (AAC) device to interact with others.

His father's cross-petition includes a certification from Jennifer Hope, Ph.D. (Dr. Hope), a licensed psychologist with a private practice, who examined the Respondent consistently from 2019 to 2021. Dr. Hope states that Respondent's 'substantial adaptive and cognitive deficits and language impairment continue to pose barriers to [his] functioning, and hamper his ability to live independently.'

2

Dr. Hope's certification is accompanied by the results of several IQ tests administered to the Respondent by YAI in 2019, with results as follows: Comprehensive Test of Nonverbal Intelligence – 2nd Edition (CTONI-2), Full Scale IQ of 51; Stanford Binet Intelligence Scales – 5th Edition – Nonverbal IQ of 42; Vineland Adaptive Behavior Scales – 3rd Edition (Comprehensive Interview Form)- "Low" range score of 20, below the 1st percentile. Although these tests were administered when the Respondent was 13 years old, their results are consistent with Dr. Olivera's recent evaluation, described above.

All three medical professionals concur that Respondent's condition is permanent in nature and render him incapable of managing himself and his affairs. All three conclude that Respondent is not capable of understanding and appreciating the nature and consequences of health care decisions, including the benefits and risks of and alternatives to any proposed health care, and of reaching an informed decision in order to promote his own well-being.

Respondent attends The Keswell School (Keswell), a specialized, local private school for autistic students up to the age of 21. Keswell follows an alternative behavior approach to learning, which is an educational approach rooted in principles of human psychology, neuroscience, and social dynamics. Respondent attends Keswell five days a week, and each parent has arranged for his transportation to and from school from their respective Manhattan residences. His class has a total of five or six students and just as many teachers. He receives occupational therapy three times per week and, despite being heavily reliant on his AAC, he receives speech therapy both individually and in a group setting. The current annual tuition at Keswell is $186,000.00 and is paid in its entirety by Respondent's father. Respondent also receives afterschool therapy four days per week from the Helping Hands agency to focus on life skills, such as travelling and housekeeping.

3

As referenced above, the Respondent's parents are in the process of getting a divorce. They separated in April of 2020, with Respondent's father leaving the marital home, and initiated a formal matrimonial action in November of 2020. The matter is still pending at the New York County Supreme Court, under Index Number: 322574/2020, before the Honorable Jeanine R. Johnson, J.S.C. The unresolved issues in that action include equitable distribution and the determination of custody of Respondent's younger brother, Zachary S.S., who turns 18 years old on July 28, 2025.

From the time the parties separated, Respondent and his brother have been living part-time with each parent in their respective Manhattan residences. More precisely, Respondent and his brother live with their father and their father's girlfriend for half of each week, and they live with their mother for the other half, alternating weekends between each parent. This shared visitation arrangement was reached by the Respondent's parents independently (with the assistance of their respective matrimonial counselors, but without court involvement) and they have adhered to said arrangement without incident. Overall delays in reaching a final resolution in the matrimonial action have been due, reportedly, to difficulties with discovery compliance and a breakdown of negotiations between the parties.

In similar fashion, a resolution to the instant guardianship proceeding, which was first filed in 2023, has been delayed due to the voluminous allegations made by each parent in their respective petitions regarding the other's inability to properly care for Respondent. In response, the court appointed a guardian *ad litem* (GAL) to conduct a more comprehensive, independent investigation.

The GAL filed his Report and Recommendation (GAL Report or Report) on or about August 27, 2024. His investigation consisted of an extensive examination of all the documents in

4

the file as well as the examination of written statements made by the parties to the GAL, at the GAL's request, in further support of their respective petitions. The investigation also consisted of interviews with nine individuals: Respondent's mother, his father (in the presence of his counsel), both the father's and the mother's respective attorneys in the matrimonial action, Respondent's pediatrician, Respondent's lead teacher at Keswell, the principal at Keswell, the behavior analyst who supervises Respondent's afterschool therapy, and to the extent possible, Respondent.

The GAL Report comes to one principal conclusion: that it is apparent to the GAL that each parent has the utmost concern for the Respondent and wants him to be in the best possible situation. The Report further explains this position is shared by every medical, educational, and vocational professional interviewed. Given this conclusion in an otherwise contested matter, the GAL recommends that the court hold a hearing to determine which parent would be a more suitable guardian or whether the parents can work together. As the Respondent's father indicated his intention of relocating the Respondent to New Jersey, the GAL further recommends the hearing should concentrate on the issues of Respondent's future schooling and residence.

Worthy of note, after the appointment of a GAL, this matter appeared on the conference calendar of the presiding Surrogate on three separate occasions in an attempt to resolve the issues presented by the parties. At each conference, they were reminded that an agreement between them, as the parents of the Respondent and the people who are most familiar with the needs of their son, was preferable to this court's determination of the contested issues. After the last conference, on November 20, 2024, the parties were given 30 days in which to inform the court whether there was any agreement on joint guardianship. The allotted time passed, and the court was not informed that the parties had resolved, or were in the process of resolving, their differences.

5

Applicable Law

Article 17-A of the SCPA governs guardianship of persons who are intellectually or developmentally disabled. An intellectually disabled person is defined by SCPA 1750 as a person who is permanently or indefinitely incapable of managing themselves and/or their own affairs because of an intellectual disability. The condition must be certified by a licensed physician and a license psychologist, or by two licensed physicians, one of whom has familiarity with or knowledge of the care and treatment of persons with intellectual disabilities.

A developmentally disabled person is defined by SCPA 1750-a as a person who has an impaired ability to understand and appreciate the nature and consequences of decisions which result in an incapacity to manage themselves and/or their own affairs. The developmental disability must be permanent or indefinite and attributable to cerebral palsy, epilepsy, neurological impairment, autism, traumatic brain injury, or any condition found to be closely related to intellectual disability. The condition must have originated before the age of 22, except for traumatic brain injury, which has no age limit. As with SCPA 1750, the developmental disability must be properly certified by the appropriate healthcare professionals.

When it appears to the court that an individual is intellectually or developmentally disabled, the court is authorized to appoint a guardian of the person for that individual, provided that the court is satisfied such appointment would be in that individual's best interest (SCPA 1750; 1750-a [1]; 1754 [5]; *Matter of Ryan T.G.*, 165 AD3d 662, 663 [2d Dept 2018]). In a contested proceeding where there are competing proposed guardians, the court must exercise the highest degree of discretion in making a 'best interest' determination (*Matter of Nicholas L.*, 2014 NYLJ LEXIS 5484, *10 [Sur Ct, Suffolk County, Feb. 28, 2014, No. 2011-3346]; *Matter of Hayley M.*, NYLJ, June 1, 1999 at 32, col 3 [Sur Ct, Nassau County 1999]). This is because it is determining

6

not only whether the implementation of a 17-A guardianship is appropriate, but also whether the appointment of a specific guardian is in the best interest of the incapacitated individual (*Matter of Nicholas L.*, at \*10; *Matter of Ivans*, NYLJ, Mar. 19, 1997, at 5, col 3 [Sur Ct, Suffolk County 1997]).

A finding of "best interest" between competing parents within the context of a 17-A proceeding is subject to the discretion and judgment of the presiding Surrogate, and not susceptible to an element-based definition as it is in a Family Court proceeding (*Matter of Robert C.B.*, NYLJ, May 26, 2020 at 27, col 1 [Sur Ct, Duchess County 2020]). Certainly, nothing impedes a Surrogate from considering any of the same factors, particularly the quality of the home environment, the ability of each parent to provide for their child's emotional and intellectual development, their financial status, and their relative fitness as a parent (*Carrington v Fowler*, 222 AD3d 747, 748 [2d Dept 2023]; *Baptiste v Gregoire*, 140 AD3d 746, 747 [2d Dept 2016]; *Hogan v Hogan*, 159 AD3d 679, 680-681 [2d Dept 2018]; *Duran v. Contreras*, 227 AD2d 1068, 1069 [2d Dept 2024]). However, in a 17-A proceeding the court also considers whether a proposed guardian has a realistic concept of a respondent's disability, to the extent that they can recognize what the immediate future and long-term needs of the respondent may be (*Matter of Nicholas L.*, at \*10). The court further evaluates the ability of a proposed guardian to prepare for a respondent's future needs by analyzing the "history and background" of their treatment of that respondent (*id.*)

Discussion

Based upon all the information presented, the court is well satisfied that Respondent is a young man in need of guardianship. On the matter of the appointment of a specific guardian, the court will first address the GAL's recommendation that a hearing be held to determine which of Respondent's parents would be a more suitable guardian or whether his parents can work together.

7

It is without question that the GAL's investigation of this case has been thorough and conscientious, allowing for a fuller understanding of the medical, educational, and personal circumstances of Respondent's life. Nevertheless, the court disagrees with the recommendation that a hearing is necessary here.

Within the Family Court context, it is well established that a hearing is not required where a court possesses "adequate relevant information" to enable it to make an "informed and provident determination" as to the best interests of a child (*Piccinini v Piccinini*, 103 AD3d 868, 870, [2d Dept 2013]; *Matter of Jayden A.*, 123 AD3d 816 [2d Dept 2014]; *Hom v Zullo*, 6 AD3d 536 [2d Dept 2004]; *Matter of Zaratzian v Abadir*, 105 AD3d 1054 [2d Dept 2013]). The court finds the same standard applicable to its appointment of a guardian here. In the instant case, substantial additional documentation was submitted to accompany the standard required paperwork, all of which has been thoroughly reviewed by the court. This documentation includes, but is not limited to, the following:

- On the NYU Patient Portal: text message threads with Dr. Price; provider note by Dr. Gabriel Chain (Dr. Chain); provider notes from Dr. Aaron E. Siegelson; admission notes by Dr. Thomas Flagiello; progress notes from Dr. Judith Bluvstein (Dr. Bluvstein); admission note by Dr. Nisha Malhotra (Dr. Malhotra);

- On the Cornell Patient Portal: text message threads with Jennifer Carver, NP; text message thread between Respondent's father and Dr. Padmaja Kandula; progress notes by Dr. Olivera; progress notes by Dr. Karen Chernoff; text message from Dr. Johanna Ferreira;

- Other 'medical provider'-related submissions: discharge notes and triage notes by Dr. Chain on the University of Pennsylvania Health System Patient Portal; provider notes by

8

Dr. Matthew Babcock from the UCONN Health System Patient Portal; letter from Dr. Bluvstein regarding Respondent's ability to travel; letter from Helping Hands regarding Respondent's progress with life skills; letter from Dr. Olivera regarding an excused school absence for Respondent; Community Habilitation (Staff Action Plan) for Respondent by the Center for Family Support;

- <u>Email interactions with Keswell, between</u>: Respondent's mother and the school nurse, Eugolo Mestre, RN; Respondent's mother and the principal, Dr. Ivy Feldman; Respondent's parents and the speech therapist, Olivia Ohland; Respondent's father and the assigned teacher, Joseph Ricca; Respondent's parents and the school nurse, teacher, and principal;

- Emails and correspondence between the parties' respective matrimonial attorneys; and

- Text message threads between Respondent's parents dated in 2023.

As stated prior, the presiding Surrogate has also conferenced this matter on several occasions, giving both parties the opportunity to explain their positions, to convey their understanding of their son's condition, and to clarify any concerns with his medical treatment and educational program. Finally, the court has gleaned a tremendous amount of insight from the information provided by the nine individuals interviewed by the GAL. Based upon the foregoing, the court will proceed to make a 'best interest' determination without a hearing.

To this effect, the court believes the best interests of this young man would be served if both parents are appointed jointly as Article 17-A co-guardians over his person, albeit with the implementation of certain terms. Joint appointment is inappropriate when one or both parents misunderstand the incapacitated individual's diagnoses to the point of failing to recognize that individual's needs (*Matter of Nicholas L.*, at *10). It is also inappropriate where the relationship

9

between both parents is so hostile that they are unable to cooperate or communicate with each other (*In re Garett "YY"*, 258 AD2d 702 [3d Dept 1999]).

This is simply not the case here. Despite their ongoing divorce litigation, which the court unmistakenly recognizes as the driving force behind the instant cross-petitions, it is clear that when it comes to Respondent, indeed to both their children, the parties are capable of joint decision-making. Both parents understand and have educated themselves for years on Respondent's diagnoses and on every one of the symptoms and conditions he manifests. Their mutual involvement in the prescription, administration, and dosage of Respondent's various medications has remained uninterrupted. This is evident from the frequency and substance of their communications with his numerous medical providers as provided to the court, all of which are dated after the time of their separation. Moreover, both parents are physically present for Respondent's medical emergencies. In Dr. Malhotra's admission note of 2023, when Respondent suffered his most recent seizure, she specifically states "both parents present at beside during daily rounds." Similarly, Dr. Olivera's letter of 2022 excusing a school absence indicates both "parents accompanied [Respondent] to visit today." During the GAL's interview with Dr. Olivera, who has been the Respondent's treating physician since infancy, she offers her observation that either parent would be able to act as a guardian.

The parties function in an identical manner when it comes to Respondent's educational and occupational needs. They are in constant communication with the professional staff at Keswell and were able to work out how Respondent travels to and from school after court conferencing. As mentioned above, the GAL interviewed Dr. Ivy Feldman, the school's principal, and Russell Krakower, Respondent's lead teacher. Both interviews came to consistent conclusions: Dr. Feldman expressed how Respondent loves both his parents, and Mr. Krakower stated that both

10

parents love the Respondent and either would make a good guardian. The GAL also interviewed Dominique Algieri, the behavior analyst who supervises Respondent's afterschool therapy with the Helping Hands agency. Ms. Algieri stated that neither parent has expressed resistance to the Respondent receiving the training he needs, and that both parents have his best interests in mind. These statements are substantiated in the Community Habilitation (Staff Action Plan) by the Center for Family Support, a written evaluation of Respondent completed in 2022 which states that "the most important people to [Respondent] are his parents as well as his brother."

Generally, appointed guardians are granted plenary decision-making power (*Matter of Chaim A.K.*, 26 Misc 3d 837, 844 [Sur Ct, NY County 2009]). That being said, the court retains the authority under SCPA 1758 to impose terms and restrictions that best meet the needs of the incapacitated individual (*Matter of Yvette A.*, 27 Misc 3d 945, 950 [Sur Ct, NY County 2010]).

In this case, the main concerns are a relocation of the Respondent and his immediate schooling needs. Respondent's father has clearly stated his intention, both at court conferences and to the GAL as relayed in the Report, of relocating the Respondent to Park Ridge, New Jersey at any time. Upon this relocation, Respondent would most likely be enrolled in a transitional program for students from the ages of 18 to 21 with special needs at Park Ridge High School (PRHS), a public school within the district. The selection of PRHS is reportedly based on a meeting between the girlfriend of Respondent's father and PRHS officials. Although the intentions of the Respondent's father's girlfriend might be well-placed, this court does not find that the selection of an educational institution for an incapacitated individual should be based on the efforts of a non-interested party who does not possess any relevant professional knowledge or qualifications.

Keswell is a private specialized school of high repute, which Respondent's father has the solvency to pay. The school's age limit is 21 years. Respondent turns 20 on June 3, 2025 and

11

therefore remains eligible to attend. The institution's staff is very familiar with Respondent's needs and, according to both parents, they have seen a positive impact on Respondent since his enrollment there. Moreover, Respondent's brother is currently a junior at Xavier High School which, like Keswell, is located in Manhattan. Respondent's continued enrollment at Keswell would not separate him from his brother, with whom he shares a deep bond.

Based on the foregoing, the court finds that Respondent benefits from having the input of both his parents when it comes to making decisions on his behalf and that depriving him of that benefit will not be in his best interests. The court further finds that Respondent's needs would best be met by keeping him enrolled at Keswell until he reaches the institution's maximum age of eligibility and by not relocating him outside of the State of New York before said time.

Regarding the additional relief sought by each parent for the appointment of a standby guardian of the Respondent's person, the court declines to make any such determination at this time. Given the current circumstances of the family, particularly the pending divorce proceeding, Respondent's remaining time of eligibility at Keswell, and the proximity of Respondent's brother to reaching the age of majority, this court considers all other determinations premature.

Accordingly, it is hereby

ORDERED that the petition filed by Respondent's mother is granted in part and denied in part; and it is further

ORDERED that the cross-petition filed by Respondent's father is granted in part and denied in part; and it is further

ORDERED that Respondents parents, Claudia M.S. and Jeffrey L.S., are hereby appointed as SCPA 17-A Co-Guardians of the person of Solomon R.S., with the authority to make decisions

12

to withhold or withdraw life-sustaining treatment on Respondent's behalf as provided under SCPA 1750-b, and it is further

ORDERED that Solomon R.S. shall continue to attend The Keswell School until he surpasses the institution's maximum age of eligibility; and it is further

ORDERED that Jeffrey L.S. shall be financially responsible for paying The Keswell School's tuition and fees for the remainder of Respondent's enrollment at the institution; and it is further

ORDERED that Solomon R.S. will remain domiciled in the State of New York, and will continue to live part-time with each parent in their respective Manhattan residences until he surpasses the maximum age of eligibility at The Keswell School; and it is further

ORDERED that Letters of Co-Guardianship shall issue to Claudia M.S. and Jeffrey L.S., subject to the above requirements and restrictions, upon their duly qualifying according to law.

The Clerk of the Court shall e-mail a copy of this decision, which constitutes the order of the court, to the following parties at the email addresses below.

Decree signed.

Dated: April 15, 2025

_____
SURROGATE

13